THE CITY OF CHICAGO, Plaintiff-Appellee, v. CHICAGO FIBER OPTIC CORPORATION, d/b/a Metropolitan Fiber Systems of Chicago, Inc., Defendant-Appellant.

First District (3rd Division)   No. 1—95—3053

Opinion filed March 26, 1997.

Peter V. Baugher and John A. Cashman, both of Schopf & Weiss, of Chicago, for appellant.

Susan S. Sher, Corporation Counsel, of Chicago (Lawrence Rosenthal, Benna Ruth Solomon, and Jean Dobrer, Assistant Corporation Counsel, of counsel), for appellee.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

The plaintiff City of Chicago (the City) filed a declaratory judgment against the defendant, Chicago Fiber Optic Corporation, d/b/a Metropolitan Fiber Systems of Chicago, Inc. (MFS), seeking a declaration that a contract between the City and MFS was enforceable. MFS filed a counterclaim against the City, seeking a declaration to the contrary. The contract arose out of an ordinance that permits MFS to run fiber optic cable for its telecommunications network under the City streets. The City imposed a franchise fee on MFS in return for MFS's use of the public ways and the City's freight tunnel system to place the fiber optic cables. MFS argued that the contract was void because it violated the public policy expressed by the Illinois Supreme Court in *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 156 Ill. 2d 399, 620 N.E.2d 1040 (1993) (hereinafter *AT&T*). The parties filed cross-motions for summary judgment. The trial court granted the City's motion and denied MFS's. On appeal, MFS contends that: (1) the City's franchise fee is illegal under *AT&T* and is unenforceable as a violation of public policy; (2) the trial court misinterpreted *AT&T* and ignored the breadth of the supreme court's holding in that case; and (3) the City is barred from denying the illegality of its franchise fee based on issue preclusion.

BACKGROUND

MFS is a telecommunications company that serves customers within the Chicago area. On March 12, 1986, MFS entered a contract with the City, agreeing to pay the City a franchise fee in return for its use of the City's public ways and freight tunnel system to provide telephone service within the City of Chicago. The contract required

MFS to pay the "greater of" a minimum annual fee (set at $30,661), a "capacity based fee" (calculated based upon the number of lineal feet of MFS's fiber optic cable in the public way), or 8% of the annual gross billings of MFS for the provision of telecommunications services or facilities in the City of Chicago, with deductions for City transaction or utility taxes on those billings. The city council approved the contract and embodied the contract in an ordinance. The ordinance recites that the City wished to grant a franchise to MFS "to facilitate the development of a competitive fiber optic telecommunications industry serving the City of Chicago."

Pursuant to the contract, MFS placed fiber optic telecommunications cables in the public ways and freight tunnels owned by the City. Since then, MFS has provided telephone service to customers within Chicago. MFS provides nonswitched private line and access telecommunications services within the Chicago area in competition with the principal local exchange carriers, Ameritech and Centel Telephone Company. Most of MFS's services involve interstate and international communications.

In 1993, MFS requested an amendment of the 1986 contract to extend the geographic area within the City in which MFS was permitted to use the public ways. On October 7, 1993, the city council passed an amended ordinance embodying the contract modifications. Under the contract, the City provides various services, including inspection and maintenance, related to the safe use of the public ways and freight tunnel system. MFS, in turn, is required to pay the City either the minimum fee or the specified percentage of its gross billings in Chicago and to maintain an insurance bond in the amount of $5 million.

MFS complied with the terms of the contract from March 12, 1986, through February 14, 1994. In July 1992, MFS asserted its option under the contract to begin paying 3% of its gross billings to Chicago residents if that figure exceeded the minimum fee called for by the contract. In October 1993, MFS began paying a fee equalling 3% of its monthly gross billings in Chicago instead of the minimum fee.

In 1993, MFS decided to stop paying the City's fee based on two decisions: *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 156 Ill. 2d 399, 620 N.E.2d 1040 (1993), and *Diginet, Inc. v. Western Union ATS, Inc.*, 958 F.2d 1388 (7th Cir. 1992), *on remand*, 845 F. Supp. 1234 (N.D. Ill. 1993), *vacated*, 845 F. Supp. 1237 (N.D. Ill. 1994). The cases held, in essence, that a city does not have a proprietary interest in its public streets, but only a regulatory interest. Therefore, a municipality cannot charge a rental fee for the use of its

public streets. MFS asserted that the City was obligated to provide MFS with access to and the use and maintenance of the public ways and that MFS was not obligated to pay the fee under the contract.

The City filed an action against MFS for declaratory judgment and other relief. MFS filed a five-count counterclaim against the City. The City later moved to dismiss all the counts of its complaint except the one seeking declaratory relief. The trial court granted the motion. The City filed a motion for summary judgment, seeking declaratory judgment against MFS. MFS opposed the motion and filed its own motion for partial summary judgment against the City on two of the counts of its counterclaim. After briefing and argument, the circuit court found that MFS had breached its contract with the City and granted the City's motion for summary judgment. The court denied MFS's motion for partial summary judgment. MFS appeals.

We affirm.

ANALYSIS

I

■ Initially, we note that this appeal was taken from the trial court's order granting summary judgment in favor of the City on the issue of whether the franchise fee imposed on MFS was enforceable. In an appeal from the grant of summary judgment, we conduct a *de novo* review. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992). Although summary judgment is a drastic means of disposing of litigation, it is an appropriate measure in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Crum Forster Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 620 N.E.2d 1073 (1993). The right of the moving party must be free and clear from doubt, and all evidence in the record must be construed strictly against the movant and liberally in favor of the opponent. *Purtill v. Hess*, 111 Ill. 2d 229, 489 N.E.2d 867 (1986); *Wagener v. Papie*, 242 Ill. App. 3d 354, 609 N.E.2d 951 (1993).

■ MFS first contends that the City's franchise fee is illegal under the Illinois Supreme Court's holding in *American Telephone & Telegraph Co. v. Village of Arlington Heights*, 156 Ill. 2d 399, 620 N.E.2d 1040 (1993). In *AT&T*, the American Telephone & Telegraph Co. and AT&T Communications of Illinois, Inc. (collectively referred to as AT&T), wished to lay fiber optic cables between Glenview and Rockford and acquired a right-of-way under a railbed from a railroad company. Because the railbed passed over public streets, AT&T also sought the right to pass under the streets of several suburban com-

munities that intersected the railbed. Those communities refused to allow AT&T to lay the cable unless it agreed to enter into a franchise agreement with each community. AT&T refused to enter into any franchise agreement; therefore, the communities refused to issue permits to AT&T. AT&T filed a complaint against the defendant municipalities and sought a preliminary injunction to prevent their future interference in the installation of the fiber optic cable under the streets. The trial court granted AT&T's preliminary injunction and later entered a permanent injunction on AT&T's behalf, which the appellate court affirmed. In affirming the appellate court, the supreme court noted that "[w]hile municipalities have the authority to enact regulations relating to the use of the public streets and to charge reasonable regulatory fees for such use, they do not have the authority to hold the public streets hostage as a means of raising revenue [citation]." *AT&T*, 156 Ill. 2d at 407-08. The court stated that the defendant municipalities had attempted to circumvent the statutory requirement that the taxing of a telecommunications company must be based upon the business originating within the corporate limits of the municipality. Because no person or entity within any of the municipalities was to be connected to or have the use of the fiber optic cable, all that AT&T sought was "to get from one side of town to the other." *AT&T*, 156 Ill. 2d at 408. The court concluded that the so-called franchise fee was, therefore, nothing more than an impermissible "toll." *AT&T*, 156 Ill. 2d at 408.

MFS also relies on a federal case, *Diginet, Inc. v. Western Union ATS, Inc.*, 845 F. Supp. 1234 (N.D. Ill. 1993). In *Diginet*, Western Union ATS, Inc. (ATS), leased fiber optic circuits that were located under the streets of the City of Chicago. ATS refused to pay the franchise fee that the City imposed. The City filed a cross-claim to restrain ATS from expanding its circuits without a franchise from the City. The district court granted the City a preliminary injunction. The Court of Appeals for the Seventh Circuit reversed and remanded, holding that the franchise fee that the City sought to impose was not a proper regulatory fee, but an improper tax. *Diginet*, 958 F.2d 1388. While the *Diginet* case was before the Court of Appeals for the Seventh Circuit, the *AT&T* case was pending before the Illinois Supreme Court. In remanding the case to the district court, the court of appeals instructed that final disposition of the case take into account the decision of the Illinois Supreme Court in *AT&T*.

On remand, the City attempted to distinguish *AT&T* on the basis that ATS sought to serve customers by extensions within the City, instead of attempting to get from one side of the town to the other. The district court rejected this distinction, stating that the City's po-

sition overlooked the rationale of the supreme court's opinion that municipalities do not possess proprietary powers over the public streets. They only possess regulatory powers. Accordingly, the court held that the City did not have the right to condition street access to fiber optic cables on payment of franchise fees. *Diginet*, 845 F. Supp. at 1236.

MFS argues that the franchise fee in the instant case is similar to the fee in *AT&T* because the City requires that MFS pay a percentage of its gross revenues for the privilege of placing fiber optic cable underneath city streets. MFS asserts that this is exactly the type of "toll" prohibited in *AT&T*. We disagree. Unlike the municipalities in *AT&T*, the business that MFS seeks to establish, *i.e.*, its telecommunication system, originates within the Chicago area. The City is not seeking to exact a "toll" or garner revenue from the use of city streets. But, rather, MFS is engaging in a franchise-type business seeking protection, licensing and special privileges for the use of the City's streets. See *AT&T*, 156 Ill. 2d at 408. In this regard, the franchise fee in the instant case differs from *AT&T*.

We note that Justice Freeman's special concurrence in *AT&T* states that his agreement with the majority opinion was limited to the facts of that case because there was too little to tie AT&T to the municipalities by virtue of the particular presence of cable to justify amounting to rent. He further stated:

"I am reluctant, however, to preclude the possibility that different circumstances could justify the types of fees sought to be imposed here. The closer a private entity is joined, economically speaking, to a municipality through use of municipal property, the stronger the argument for fees amounting to rent becomes."

*AT&T*, 156 Ill. 2d at 415 (Freeman, J., specially concurring).

■ MFS also contends that the franchise agreement violates the policy of the state to encourage the growth of competitive telecommunication services like those offered by MFS. MFS refers to the legislative findings of the Illinois Universal Telephone Service Protection Act (the Act), which states in pertinent part:

"(a) universally available and widely affordable telecommunication services are essential to the health, welfare and prosperity of all Illinois citizens [and]

\*\*\*

(c) the competitive offering of telecommunications services may create the potential for increased innovation and efficiency in the provision of telecommunications services and reduced prices for consumers[.]" 220 ILCS 5/13—102(a), (c) (West 1992).

The Act further declares as State policy:

"(a) telecommunications services should be available to all Il-

linois citizens at just, reasonable and affordable rates and that such services should be provided as widely and economically as possible in sufficient variety, quality, quantity and reliability to satisfy the public interest;

\* \* \*

(f) development of and prudent investment in advanced telecommunications networks that foster economic development of the State should be encouraged." 220 ILCS 5/13—103(a), (f) (West 1992).

MFS states that allowing the City to continue to tax telecommunications companies that entered into agreements with it, rather than be excluded from the Chicago market, contravenes these express legislative statements of Illinois public policy. We disagree. Public policy, a principle of law which declares that no one may lawfully do that which has a tendency to be injurious to the public welfare, is found in our constitution, statutes and judicial decisions. *McClure Engineering Associates, Inc. v. Reuben H. Donnelley Corp.*, 95 Ill. 2d 68, 71-72, 447 N.E.2d 400 (1983). Public policy strongly favors the freedom to contract. *McClure Engineering*, 95 Ill. 2d at 72. In fact, where a contract is illegal or against public policy, a court will not, at the urging of one of the parties, set it aside after it has been executed, because to give such relief would injure and counteract the public good. *Telenois, Inc. v. Village of Schaumburg*, 256 Ill. App. 3d 897, 903, 628 N.E.2d 581 (1993).

With respect to home rule units, the method by which the City procures its contracts is a matter of local concern. See *American Health Care Providers, Inc. v. County of Cook*, 265 Ill. App. 3d 919, 926, 638 N.E.2d 772 (1994). However, state legislation always prevails when it expresses the intent to be exclusive and to preclude local regulation. Otherwise, home rule units retain the power to act concurrently and are left free to complement the state activity. *American Health*, 265 Ill. App. 3d at 927. However, legislation passed by the General Assembly must contain express language that the area covered by the legislation is to be exclusively controlled by the State; it is not enough that the State comprehensively regulates an area that otherwise would fall into home rule power. *American Health*, 265 Ill. App. 3d at 928; *Village of Bolingbrook v. Citizens Utilities Co.*, 158 Ill. 2d 133, 138, 632 N.E.2d 1000 (1994).

In the instant case, although the Act sets forth its purpose and policy, the Act does not preclude contractual agreements between telephone companies and municipalities and does not expressly or impliedly contain language that franchise fee arrangements are exclusively controlled by the State. Our holding reinforces a long-

standing tradition in regard to home rule units and their powers to contract. In *City of Springfield v. Inter-State Independent Telephone & Telegraph Co.*, 279 Ill. 324, 116 N.E. 631 (1917), our supreme court held that an ordinance authorizing a telephone company to place its equipment on the public ways if it paid a fee was not beyond the scope of municipal power. The court stated that the franchise ordinance, upon its acceptance and the construction of the system of telephones, became a contract the terms of which were binding upon the city and the telephone company and could not be varied by either without the consent of the other. *City of Springfield*, 279 Ill. at 327; see *Village of West City v. Illinois Commercial Telephone Co.*, 372 Ill. 493, 24 N.E.2d 352 (1939).

## II

■ MFS next contends that the trial court misinterpreted *AT&T* and ignored the breadth of the supreme court's holding in that case by relying on *dicta* from *AT&T*:

> "While AT&T and the defendant municipalities could have voluntarily entered into a contractual relationship under which AT&T would have agreed to pay for the undercrossing of public streets, *absent such an agreement, defendants do not have the right to force AT&T to pay a toll under the guise of a franchise agreement.* Additionally, it is immaterial that the defendants have been able to coerce other companies into similar agreements or that AT&T has been coerced into such agreements in the past." (Emphasis added.) *Arlington Heights*, 156 Ill. 2d at 413.

We disagree with MFS. In our opinion, the primary reason why the *AT&T* decision is not controlling in the instant case is that the City here seeks to enforce the franchise fee based on contract. This language from *AT&T* with which MFS finds fault underscores the weakness of the MFS argument. The contention by MFS that this language in *AT&T* is *dicta* and doesn't mean what it seems to mean is not compelling. In our view, this language is in derogation of the contention of MFS that the *AT&T* holding bars the enforcement of franchise fees by municipalities for the use of public ways by fiber optic companies in contractual as well as noncontractual arrangements between the parties.

■ MFS next asserts that the trial court erroneously concluded that the 1986 ordinance was a voluntary agreement exempt from the supreme court's prohibition against revenue-raising fees. MFS argues that, in light of the supreme court's holding that municipalities may not use their power over the public ways to impose revenue-raising fees, franchise agreements are forced rather than voluntarily entered. MFS contends, therefore, that the 1986 agreement was not voluntary

because MFS could either pay the revenue or forfeit doing business in the Chicago market.

Courts will generally not interfere with contracts to which parties have agreed unless there existed, at the time the contract was formed, a defect in the negotiation process. *Dana Point Condominium Ass'n, Inc. v. Keystone Service Co., a Division of Cole Coin Operated Laundry Equipment, Inc.*, 141 Ill. App. 3d 916, 920, 491 N.E.2d 63 (1986). Such defects include disparity in bargaining power, the absence of meaningful choice on the part of one party, and the existence of fraud, duress, or mistake. *Dana Point*, 141 Ill. App. 3d at 920. Absent any such defect, however, a contract will be enforced as written and a court will not set aside a contract merely because that agreement later turns out to be a bad bargain for one of the parties. *Dana Point*, 141 Ill. App. 3d at 920.

In the instant case, the first MFS-City ordinance was adopted in 1984. The City increased the fees later that year. Subsequently, MFS entered into another agreement with the City in 1986. There is no indication that, at the time that MFS entered into an agreement with the City in 1986, MFS was coerced or entered the agreement under duress. MFS voluntarily agreed to pay the higher fees in order to do business in Chicago. As a competent party to the negotiation, we believe that MFS was aware of the business risks and, therefore, should stand by its own agreement. See *McClure*, 95 Ill. 2d at 72-73.

MFS also argues that the court implicitly found that MFS waived its right to object to paying the fee by signing the 1993 ordinance modification two months after *AT&T* was decided. However, in viewing the trial court's finding, we do not believe that the trial court based its decision on the timing of the agreement. Rather, we believe that the trial court based its finding on the fact that MFS had signed a contractual agreement to pay the franchise fee and MFS had breached this contract by its failure to pay. Unlike the AT&T Company in the *AT&T* case, MFS chose to sign an agreement to pay the franchise fee.

MFS also argues that it never intended to waive any rights with the 1993 modification. Waiver is an intentional relinquishment of a known right. *Greene v. Helis*, 252 Ill. App. 3d 957, 962, 625 N.E. 2d 162 (1993). It may be accomplished by express agreement or may be implied from a party's conduct. *Greene*, 252 Ill. App. 3d at 962; *Crum*, 156 Ill. 2d at 396. The party claiming implied waiver has the burden of proving a clear, unequivocal, and decisive act of the opponent manifesting his intention to waive his rights. *Green*, 252 Ill. App. 3d at 962.

In the instant case, we believe that the signing of the 1993

contract was a clear and decisive act that MFS intended to waive any right to contest the franchise fee. As we stated earlier, there is no indication that the contract was entered into under duress or that the contract was a result of unconscionable influences. Therefore, we agree with the trial court that MFS's failure to pay constituted a breach of contract.

## III

■ Lastly, MFS contends that the City is barred from denying the illegality of its franchise fee based on collateral estoppel because the City litigated the same issues in *AT&T* and *Diginet.* The City argues that there is no basis for applying collateral estoppel because collateral estoppel does not apply to pure questions of law and MFS has not satisfied the requirements for collateral estoppel.

Defensive use of collateral estoppel precludes a plaintiff from relitigating issues by switching adversaries and thus gives a plaintiff an incentive to try and join all defendants in the first action. *In re Owens,* 125 Ill. 2d 390, 398, 532 N.E.2d 248 (1988). The threshold requirements, as set forth in *Illinois State Chamber of Commerce v. Pollution Control Board,* 78 Ill. 2d 1, 7, 398 N.E.2d 9 (1979), are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication.

We believe that MFS fails to establish that collateral estoppel applies to the instant case for two reasons. First, the doctrine of collateral estoppel pertains to the relitigation of facts, not to questions of law. *Denton Enterprises, Inc. v. Illinois State Toll Highway Authority,* 77 Ill. App. 3d 495, 503, 396 N.E.2d 34 (1979), quoting *Village of Northbrook v. Cannon,* 61 Ill. App. 3d 315, 322, 377 N.E.2d 1208 (1978). In the instant case, MFS filed a motion for summary judgment based on whether the franchise fee violates Illinois public policy. This issue is clearly a question of law and, therefore, collateral estoppel would not apply.

Second, assuming *arguendo* that the issue presented in the instant case was a question of fact, we believe that collateral estoppel still would not apply because MFS fails to meet the first element of collateral estoppel. In the case *sub judice,* MFS challenges the enforceability of the contract that it entered into with the City. However, in *AT&T* and *Diginet,* the parties had not entered into any contractual arrangement with the municipalities. Instead, they sought injunctive relief.

Furthermore, *AT&T*, as we stated earlier, involved fees imposed upon the telecommunication companies for running the fiber optic cables through the municipalities, whereas, in the instant case, the telecommunication system that MFS has established originates in the City and is not merely passing through. We conclude, therefore, that the legal question at issue in the instant case, *i.e.*, whether Illinois public policy precludes enforcement of the contract between a telecommunications company and a municipality, was not decided by either *AT&T* or *Diginet*. We now hold that Illinois public policy favors the enforcement of contracts (see *McClure Engineering*, 95 Ill. 2d at 72) and that the contract in the instant case between the City of Chicago and MFS is enforceable.

For the reasons cited herein, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GORDON and LEAVITT, JJ., concur.