FOURTH DIVISION
AUGUST 23, 2007

No. 1-05-3566

| | | |
|---|---|---|
| THE CITY OF CHICAGO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| COMCAST CABLE HOLDINGS, L.L.C., f/k/a AT&T | ) | |
| Broadband, L.L.C.; COMCAST OF CHICAGO, INC., | ) | |
| f/k/a Communications & Cable of Chicago, Inc.; | ) | |
| COMCAST OF ILLINOIS III, INC., f/k/a LaSalle | ) | |
| TELECOMMUNICATIONS, INC.; COMCAST OF | ) | |
| SOUTH CHICAGO, INC., f/k/a South Chicago Cable Inc.; | ) | |
| COMCAST OF FLORIDA/ILLINOIS/MICHIGAN, INC., | ) | |
| f/k/a Prime Communications-Chicago, L.L.C.; | ) | |
| RCN CABLE TV OF CHICAGO, INC., and | ) | |
| WIDEOPENWEST ILLINOIS, INC., | ) | Honorable |
| | ) | Peter Flynn, |
| Defendant-Appellees. | ) | Judge Presiding. |

MODIFIED OPINION

JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, the City of Chicago (City), appeals from an order of the circuit court of Cook

County dismissing its action to recover certain cable franchise fees from defendants, multiple

companies that provide Internet and cable service in Chicago, including Comcast,[1] RCN Cable TV

---

[1]Comcast comprises the following defendants:  Comcast Cable Holdings, L.L.C., f/k/a

AT&T Broadband, L.L.C., Comcast of Chicago, Inc., f/k/a Communications & Cable of Chicago,

Inc., Comcast of Illinois III, Inc., f/k/a LaSalle Telecommunications, Inc., Comcast of South

of Chicago, Inc. (RCN), and Wideopenwest Illinois, Inc. (WOW) (defendants).[2]  The trial court determined that the City is preempted under federal law from recovering a cable franchise fee from defendants in the amount of 5% of defendants' annual gross revenues.  On appeal, the City contends that:  (1) the franchise agreements between the City and defendants for payment of franchise fees on revenues derived from cable modem service are valid contracts under state law; and (2) neither the Federal Communications Act nor the federal Internet Tax Freedom Act preempts the state franchise agreement provisions that require payment of franchise fees on revenue derived from cable modem service.  For the following reasons, we reverse the judgment of the trial court, vacate its order, and remand this matter to the trial court for further action as necessary consistent with the specific matters addressed in this opinion.

### BACKGROUND

In this case, we must determine whether cable companies that provide cable television and cable modem (Internet) services to customers in the City of Chicago must pay a 5% franchise fee to the City in order to provide each service, as contemplated by "Franchise Renewal Agreement" contracts.  Below, we set forth both a brief history of the regulation of cable television and Internet services and the procedural history relevant to this case.

---

Chicago, Inc., f/k/a South Chicago Cable, Inc., and Comcast of Florida/Illinois/Delaware, Inc., f/k/a Prime Communications-Chicago, L.L.C.

[2]RCN and WOW filed a separate brief adopting the Comcast brief in its entirety and presenting no additional arguments.

I. History of Cable Television Franchise Fees

A brief history of the revenues associated with cable television provides a clearer understanding of the genesis of the dispute between the City and the defendant cable operators.

Cable operators began to offer cable television to cities and municipalities in the 1960s. Some cities, acting as local franchising authorities (LFAs), began to impose franchise fees upon the cable operators. In 1972, the Federal Communications Commission (FCC) issued an order to "clarify the respective federal, state, and local regulatory roles" of the cable operators and the municipalities, and capped the LFA franchise fees. In re Amendment of Part 74, Subpart K, of the Commission's Rules and Regulations Relative to Community Antenna Television Systems, Cable Television Report & Order, 36 F.C.C.2d 143, par. 171 (F.C.C. February 3, 1972) (Community Antenna Television Systems). The FCC explained its rationale for capping the LFA franchise fees as follows:

> "[M]any local authorities appear to have extracted high franchise fees more for revenue-raising than for regulatory purposes. Most fees are about five or six percent, but some have been known to run as high as 36 percent. The ultimate effect of any revenue-raising fee is to levy an indirect and regressive tax on cable subscribers." Community Antenna Television Systems, 36 F.C.C.2d 143, at par. 185.

The FCC placed a 5% cap on the franchise fees cities and other local governments were allowed to collect and preempted franchise agreement clauses imposing fees above the 5% cap. Community Antenna Television Systems, 36 F.C.C.2d 143, at par. 186.

In 1985, Congress codified the FCC's regulatory scheme in Title VI of the Federal Communications Act of 1934 (Communications Act). See Cable Communications Policy Act of 1984, Pub. L. No. 98-549, 98 Stat. 2779 (October 30, 1984) (effective 60 days after enactment, 98 Stat. 2806). Congress amended the Communications Act to place a ceiling on franchise fees. Section 542(b) capped franchise fees by providing: "For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed five percent of such cable operator's gross revenues derived in such period from the operation of the cable system." 47 U.S.C. §542(b) (Supp. 1984).

In 1996, Congress again amended the Communications Act and encouraged cable operators to provide services beyond traditional cable television services. The 5% cap on franchise fees remained intact but the 1996 Act limited the collection of franchise fees to a "cable operator's gross revenues derived * * * from the operation of the cable system to provide cable services." Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (1996 Act).

In 1998, cable operators began to offer "cable modem service" (Internet) to customers. By upgrading their systems to include fiber optic cable, Internet servers and other equipment, cable operators could provide high speed Internet access that was much faster than dial-up service. See In re Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities, Notice of Inquiry, 15 F.C.C. R. 19287, par. 6 (September 28, 2000). In response, LFAs began requesting 5% payment on revenues derived from cable modem services.

On March 15, 2002, the FCC issued a ruling determining that "cable modem service as currently provided is an interstate information service, not a cable service." In re Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities, 17 F.C.C.R. 4798,

4819 at par. 33 (F.C.C., March 15, 2002) (FCC Declaratory Ruling). The FCC further held that "[g]iven that we have found cable modem service to be an information service, revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined." FCC Declaratory Ruling, 17 F.C.C.R. 4851, at par.105.

## II. Franchise Renewal Agreements

In 1985, each cable operator defendant in this case, either directly or through a predecessor, entered into a 15-year franchise agreement (Agreement or Agreements) with the City to provide cable television services. The Agreements give each defendant the right to extend, install, maintain, and operate a cable system within a specified franchise area in the City, incorporating sections 4-280-170 (A) and (B) of the Chicago Cable Ordinance. Chicago Municipal Code §§ 4-280-170(A), (B) (amended December 9, 1992) (Cable Ordinance).

Section 4-280-030 (A) sets forth the definitions of terms incorporated into the Agreements and defines the various types of services provided by cable operators. "Auxiliary services" is defined as:

> "any communications services in addition to 'regular
>
> subscriber services' including, but not limited to * * * data or other
>
> electronic transmission services * * * interactive two-way services
>
> and any other service utilizing any facility or equipment of a cable
>
> television system operating pursuant to a franchise granted under
>
> this chapter." Chicago Municipal Code §4-280-030(A) (2003).

Paragraph 4.1 of each Agreement provided that in exchange for access to public rights-of-way, each defendant will pay a franchise fee in the amount of 5% of its gross revenues during the period of the Agreement:

5

"Pursuant to Sections 4-280-170(A) and (B) of the Cable Ordinance, the [franchisee] shall pay to the City a franchise fee of five percent (5%) of the annual gross revenues received by the [franchisee] during the period of its operation under this Agreement."

The Agreement does not contain a definition of "annual gross revenues," but provides that "[t]he terms * * * set forth in this Section 4 are pursuant to the terms * * * set forth in Sections 4-280-050 (C) and 4-280-170 of the Cable Ordinance as interpreted and applied in accordance with Section 542 of the Communications Act." Section 4-280-030(N) defines "gross revenues" as "all revenue derived directly or indirectly from the operation or use of all or part of a cable television system *** including *** revenue from regular subscriber service fees, [and] auxiliary service fees." Chicago Municipal Code §4-280-030(N) (2001).

Paragraph 4.6 of each Agreement provides that "[p]ayment by the Grantee to the City of the franchise fee and other fees set forth herein shall not be considered in the nature of a tax."

On March 29, 2000, each defendant signed a Franchise Renewal Agreement (Renewal Agreement) for a 15-year term. The terms of each Renewal Agreement were substantively identical to the terms of the original Agreements.

On March 15, 2002, as noted above, the FCC issued a declaratory ruling stating that "cable modem service" is not the same as "cable television service."

In March 2002, defendants informed the City that they planned to stop paying franchise fees on revenue from cable modem service pursuant to the aforementioned FCC declaratory ruling. Beginning in April 2002, each defendant ceased payment of the 5% franchise fees on that portion of its revenues. The City informed defendants that they were required to pay franchise

fees on revenue from cable modem service under the Renewal Agreement. Defendants disagreed and refused to comply with the City's demands to pay the fees.

On September18, 2002, the City filed an action against defendants in the chancery division of the circuit court of Cook County. City of Chicago v. AT& T Broadband, Inc., No. 02 CH 17039 (Comcast I).[3] On defendants' motion, the case was removed to federal district court on October 29, 2002. Defendants moved to dismiss the City's complaint citing section 542 of the Communications Act. 47 U.S.C. §542 (1984). Defendants asserted that in light of the FCC declaratory ruling, federal law preempted the City from collecting franchise fees on cable modem service.

On September 4, 2003, the district court granted defendants' motion to dismiss. City of Chicago v. AT&T Broadband, Inc., No. 02-C-7517 (N.D. Ill. September 4, 2003) (Comcast II). On October 23, 2003, the City appealed to the United States Court of Appeals for the Seventh Circuit.

On September 14, 2004, the Seventh Circuit heard oral argument on this case. On October 1, 2004, the Seventh Circuit vacated the district court opinion and ordered the district court to remand the case to state court on jurisdictional grounds. The Seventh Circuit declined to consider the merits of the case. City of Chicago v. Comcast Cable Holdings, L.L.C., 384 F.3d 901 (7th Cir. 2004) (Comcast III). On January 6, 2005, the district court remanded this case to the circuit court pursuant to the mandate of Seventh Circuit.

---

[3]AT&T Broadband is one predecessor to the Comcast defendants.

After remand, defendants again moved to dismiss the City's complaint on the same grounds. The trial court granted defendants' motions and dismissed the City's complaint without prejudice. The trial court found as follows:

"I cannot read either Section 542 or the FCC ruling other than as clearly stating that franchise fees are allowable only to the extent that they do not exceed five percent of gross revenue derived from cable service, which means excluding any component of that revenue that is derived from cable modem service.

\*\*\*

The Court also presently takes no position on whether, assuming that to be possible within the rubric of reformation, it is possible not withstanding [*sic*] the Internet Tax Freedom Act, which obviously has a bearing here, and whether - - even assuming those hurdles are overcome, the City has the Home Rule Authority to get where it wants to go \*\*\*."

On October 5, 2005, the trial court denied the City's subsequent motion for reconsideration, instead, offering the City the opportunity to amend its complaint. The City declined to amend its complaint and filed this timely appeal.

OPINION

On appeal, the City contends that the Renewal Agreements are enforceable contracts under Illinois law. The City argues that neither section 542(b) of the Communications Act nor the Internet Tax Freedom Act (47 U.S.C. §151 (2000)) (ITFA) prohibits the payment of franchise

fees on cable modem service pursuant to the aforementioned franchise Agreement. We interpret contracts *de novo*. Cwikla v. Sheir, 345 Ill. App. 3d 23, 801 N.E.2d 1103 (2003).

A. Home Rule and Enforceable Contracts

Initially, the City argues that the Renewal Agreements are valid and enforceable contracts and require payment of 5% of defendants' annual "gross revenues." The City cites section 29.1 of the Renewal Agreements, entitled "Governing Law," which provides that the Agreements "shall be construed pursuant to the laws of the State of Illinois unless otherwise preempted by federal law."

Illinois courts consistently hold that words used in a contract must be given their plain and ordinary meaning. See, *e.g.*, Johnstowne Centre Partnership v. Chin, 99 Ill. 2d 284, 287-88, 458 N.E.2d 480, 481 (1983); Hunt v. Farmers Insurance Exchange, 357 Ill. App. 3d 1076 (2005). Clear and unambiguous contract terms control the rights of the parties. Golden Rule Insurance Co. v. Schwartz, 203 Ill. 2d 456, 786 N.E.2d 1010 (2003); Srivastava v. Russell's Barbeque, Inc., 168 Ill. App. 3d 726, 730, 523 N.E.2d 30, 33 (1988).

Section 4.1 of the Renewal Agreements, entitled "Franchise Fee," provides in pertinent part: "Pursuant to Sections 4-280-170(A) and (B) of the Cable Ordinance," defendants shall pay the City a franchise fee of 5% of their "gross revenues" during the period of operation under the agreements. Under section 4-280-170 of the Cable Ordinance, "Franchise Fee and Other Compensation," the recipient of a franchise "shall pay to the [C]ity a franchise fee of not less than five percent of its annual gross revenues during the period of its operation under the franchise." Chicago Municipal Code §4-280-170(A) (amended December 9, 1992).

As detailed above, "gross revenues" is defined in the Code as "all revenue derived directly or indirectly from the operation or use of all or part of a cable television system *** including ***

9

auxiliary services."  Chicago Municipal Code §4-280-030(N) (2001).  "Auxiliary services" includes "data or other electronic transmission services *** and any other service utilizing any facility or equipment of a cable television system."  Chicago Municipal Code §4-280-030(A)(2001).  Thus, the Renewal Agreements, valid contracts under Illinois law, contemplate that a 5% franchise fee is due and payable based on defendants' gross revenues, which include revenues from cable modem service.

The Illinois Constitution grants the City the home rule powers of licensing, taxing and regulatory authority on any matter pertaining to its "government and affairs."  Ill. Const. 1970, art. VII, §6(e).  The City, therefore, has the authority to enforce the Renewal Agreements as valid contracts under the constitutional authority of home rule.

The Illinois Constitution further provides that the "[p]owers and functions of home rule units shall be construed liberally." Ill. Const. 1970, art. VII, §6(m).  Cable franchising is specifically addressed in section 11-42-11(a) of the Illinois Municipal Code, which authorizes franchises of "community antenna television systems."  65 ILCS 5/11-42-11(a) (West 2000); Ill. Const. 1970, art. VII, §6(e).  Cable television systems are a type of "community antenna television system" and therefore are within a municipality's ability to franchise.

This court considered a municipality's home rule power to enter into and enforce franchise agreements in City of Chicago v. Chicago Fiber Optic Corp., 287 Ill. App. 3d 566, 678 N.E.2d 693  (1997). There, the City of Chicago (City) entered into a franchise agreement (contract) with Chicago Fiber Optic, d/b/a Metropolitan Fiber Systems of Chicago, Inc. (MFS), a telephone services provider, to run fiber optic cable for its telecommunications network under the streets of Chicago.  The agreement required MFA to pay a 3% annual franchise fee for it's use of the public ways and the City's freight tunnel system to place the optic cables.  MFS placed the

cables in the public ways and freight tunnels and provided telephone service to customers in Chicago. Seven years later, MFS requested an amendment to the contract to extend the geographic area within the City in which it was permitted to use the public ways, and the City modified the contract. Later that same year, MFS decided to cease paying the 3% annual franchise fee based on two cases: American Telephone & Telegraph Co. v. Village of Arlington Heights, 156 Ill. 2d 399 (1993) (Arlington Heights), and Diginet, Inc. v. Western Union ATS, Inc., 958 F.2d 1388 (7th Cir.1992), *on remand*, 845 F. Supp. 1234 (N.D. Ill. 1993), *vacated,* 845 F. Supp. 1237 (N.D. Ill. 1994). These cases held that a city has only a regulatory interest in its public streets, not a proprietary interest. There, the City asserted that MFS was required to pay the franchise fee and sought a declaration that the contract was enforceable and that MFS breached the contract. Fiber Optic, 287 Ill. App. 3d at 569, 678 N.E.2d at 695.

The trial court found that MFS breached its contract with the City and this court affirmed. In so concluding, this court distinguished Arlington Heights and Diginet.[4] In Arlington Heights, the AT&T phone company wanted to lay fiber optic cables between Glenview and Rockford, Illinois, and acquired a right-of-way under a railbed from a railroad company. Because the railbed passed over public streets, AT&T sought the right to pass under the streets of several communities that intersected the railbed, including Arlington Heights. The communities refused to allow AT&T to lay the cable without entering into a franchise agreement with each community. AT&T refused to enter into any agreements and the communities refused to issue permits to lay the cable. AT&T sought and obtained an injunction to prevent future interference with the

---

[4]See Fiber Optic for a discussion of the Diginet case. Fiber Optic, 287 Ill. App. 3d at 570-77.

installation of the cable under the streets, and the injunction was affirmed on appeal. In affirming this court, our supreme court stated: "While municipalities have the authority to enact regulations relating to the use of the public streets and to charge reasonable regulatory fees for such use, they do not have the authority to hold the public streets hostage as a means of raising revenue." Arlington Heights, 156 Ill. 2d at 407-08, citing Village of Lombard v. Illinois Bell Telephone Co., 405 Ill. 209, 217-18, 90 N.E.2d 105 (1950). The court concluded: "[M]unicipalities only have regulatory powers over public streets and cannot charge tolls for their use." Arlington Heights, 156 Ill. 2d at 410, 620 N.E.2d at 1045.

In Fiber Optic, this court distinguished the franchise fee charged there from the "impermissible toll" found to have been charged in Arlington Heights, finding: "Unlike the municipalities in AT&T, the business that MFS seeks to establish, *i.e.*, its telecommunications system, originates within the Chicago area. The City is not seeking to exact a 'toll' or garner revenue from the use of city streets" but, rather, the court held, MFS is "seeking *** special privileges for the use of the City's streets." Fiber Optic, 287 Ill. App. 3d at 572. This court enforced the franchise fee on MFA, noting that "[c]ourts will generally not interfere with contracts to which parties have agreed," unless there was a defect in the contract negotiating process. Fiber Optic, 287 Ill. App.3d at 575, citing Dana Point Condominium Ass'n, Inc. v. Keystone Service Co. Division of Cole Coin Operated Laundry Equipment, Inc., 141 Ill App. 3d 916, 920 (1986). This court concluded: "Illinois public policy favors the enforcement of contracts." Fiber Optic., 287 Ill. App. 3d at 577.

Here, as in Fiber Optic, the cable modem "lines" at issue do, in fact, serve the residents of Chicago via the public right-of-way. Thus, this case is distinguishable from Arlington Heights. The 5% fee is neither a toll nor a tax, but a franchise fee agreed to be paid by defendants in a valid

contract in exchange for the use of the City's right-of-way. As detailed above, the City has the authority under the home rule provision of the Illinois Constitution to enforce its valid Renewal Agreements that include the 5% franchise fee.

### B. Preemption: Communications Act Section 542(b)

We now turn to the City's next argument, that the trial court erred in finding that the Renewal Agreements, even though valid and enforceable contracts, are preempted by section 542(b) of the Communication Act.

Initially, we note that defendants argued preemption in their motion to dismiss the City's complaint for failure to state a cause of action. A section 2-615 motion to dismiss pursuant to the Illinois Code of Civil Procedure (Code) challenges the legal sufficiency of a complaint based on defects apparent on its face. 735 ILCS 5/2-615 (West 2004); Marshall v. Burger King Corp., 222 Ill. 2d 422 (2006). Federal preemption, however, is a defect, defense, or affirmative matter properly alleged in a motion to dismiss pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2004)). Fidelity Federal Savings & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152, 73 L. Ed. 2d 664, 674-75, 102 S. Ct. 3014, 3022 (1982); Cohen v. McDonald's Corp., 347 Ill. App. 3d 627, 633 (2004).

Defendants improperly raised the affirmative defense of preemption in their section 2-615 motion to dismiss and their motion was defective in this respect. A defendant's failure to specifically designate whether a motion to dismiss is brought pursuant to section 2-615 or section 2-619 is not always fatal; however, reversal is required if prejudice results to the nonmovant. Illinois Graphics Co. v. Nickum, 159 Ill. 2d 469, 484 (1994); Jenkins v. Concorde Acceptance Corp., 345 Ill. App. 3d 669, 674 (2003). "When confronted with such an omission, however, reviewing courts typically review the nondesignated motion according to its grounds, requests, or

its treatment by the parties and the trial court." Nickum, 159 Ill. 2d at 484. Accordingly, we examine the grounds of defendants' motion, as well as the treatment of the motion in the trial court, to decide the propriety of the trial court's ruling. See Nickum, 159 Ill. 2d at 484.

The issue before this court is whether the franchise fee provision of section 542 of the Communications Act preempts the City's Renewal Agreements, authorized by state law, that require payment of franchise fees on cable modem service offered over a cable system. Preemption is invoked under the supremacy clause of the United States Constitution, which makes federal law "the supreme Law of the Land." U.S. Const. art. VI, cl. 2. As such, federal statutes and regulations properly enacted and promulgated " 'can nullify conflicting state or local actions.' " National Home Equity Mortgage Ass'n v. Face, 239 F.3d 633, 637 (4th Cir. 2001), quoting Worm v. American Cyanamid Co., 970 F.2d 1301, 1304-05 (4th Cir. 1992). Federal law preempts state law when the latter " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " Ginn v. Consolidation Coal Co., 107 Ill. App. 3d 564, 565 (1982), quoting Hines v. Davidowitz, 312 U.S. 52, 67, 85 L. Ed. 581, 586-87, 61 S. Ct. 399, 404 (1941).

Preemption however, is a disfavored doctrine (Wisconsin Public Intervenor v. Mortier, 501 U.S. 597, 605, 115 L. Ed. 2d 532, 542-43, 111 S. Ct. 2476, 2481-82 (1991); Scholtens v. Schneider, 173 Ill. 2d 375, 379, 671 N.E.2d 657 (1996)), and requires that congressional intent be clear and manifest, as "[a] presumption exists in every preemption case that Congress did not intend to supplant state law" (Tri-State Coach Lines, Inc. v. Metropolitan Pier & Exposition Authority, 315 Ill. App. 3d 179, 194, 732 N.E.2d 1137, 1149 (2000)).

When considering whether a local law is preempted by a federal law, " 'we start with the assumption that the historic police powers of the States were not to be superceded by the Federal

Act unless that was the clear and manifest purpose of Congress.' " Mortier, 501 U.S. at 605, 115 L. Ed. 2d at 543, 111 S. Ct. at 2482, quoting Rice v. Santa Fe Elevator Corp, 331 U.S. 218, 230, 91 L. Ed.1447, 1459, 67 S. Ct. 1146, 1152 (1947). State law is preempted by federal law when one or more of the following three circumstances exist: (1) when Congress has clearly expressed an intention to do so (express preemption); (2) when Congress has clearly intended, by legislating comprehensively, to occupy an entire field of regulation (field preemption); and (3) when a state law conflicts with federal law (conflict preemption). Van Der Molen v. Washington Mutual Finance, Inc., 359 Ill. App. 3d 813 (2005).

Courts historically recognize that municipal police powers exist to require businesses that seek to use public rights-of-way to enter into franchise agreements with municipalities. MacKay Telegraph & Cable Co. v. City of Little Rock, 250 U.S. 94, 99-100, 63 L. Ed. 863, 868-69, 39 S. Ct. 428, 430-31 (1919); Atlantic & Pacific Telegraph Co. v. City of Philadelphia, 190 U.S. 160, 163, 47 L. Ed. 995, 999, 23 S. Ct. 817, 818 (1903); City of St. Louis v. Western Union Telegraph Co., 149 U.S. 465, 469-70, 37 L. Ed 810, 813-14, 13 S. Ct. 990, 991-92 (1893). Section 542 of the Communications Act specifically authorizes state and local governments to impose a franchise fee on cable operators that provide cable service. Subsection (a) provides: "Subject to the limitation of subsection (b) of this section, any cable operator may be required under the terms of any franchise to pay a franchise fee." 47 U.S.C. §542(a) (2000).

The Communications Act defines a "cable operator" as:

> "[a]ny person or group of persons (A) who provides cable
>
> service over a cable system and directly or through one or more
>
> affiliates owns a significant interest in such cable system, or (B)
>
> who otherwise controls or is responsible for, through any arrange-

ment, the management and operation of such a cable system." 47

U.S.C. §522(5) (2000).

Section 522(6) defines "cable service" as follows:

"(A) the one-way transmission to subscribers of (i) video

programming, or (ii) other programming service, and

(B) subscriber interaction, if any, which is required for the

selection or use of such video programming or other programming

service." 47 U.S.C. §522(6) (2000).

Finally, section 542(b) limits the franchise fee to 5%:

"For any twelve-month period, the franchise fees paid by a

cable operator with respect to any cable system shall not exceed 5

percent of such cable operator's gross revenues derived in such

period from the operation of the cable system to provide cable

services." 47 U.S.C. §542(b) (2000).

The stated intent of sections 541 and 542 is to "preserve[] the regulatory and jurisdictional status quo with respect to non-cable communication[] services." H.R. Rep. No. 98-934, at 29 (1984), 98 Stat. 4666. The 1996 Act amended section 542(b) adding the phrase, "to provide cable services," and thereby narrowed the scope of the cable franchise fee base. See Pub. L.104-104, §303(b), 110 Stat.125 (1996). The amendment is explained in the House Conference report as follows:

"Subsection (b) amends section 622(b) of the Communi-

cations Act by inserting the phrase 'to provide cable services.' This

amendment makes clear that the franchise fee provision is not

intended to reach revenues that a cable operator derives for providing new telecommunications services over its system, but only the operators['] cable-related revenues." H.R. Conf. Rep. No. 104-458, at 180 (1996), Pub. L. No. 104-104, §303(b), 110 Stat. 125 (1996).

The City argues that if "cable modem service" is "cable service," the City is limited to a collectible franchise fee of 5% of cable operators' gross revenues. The City points out, however, that section 542(b) neither clearly nor manifestly limits municipal authority to collect franchise fees on the provision of anything other than *cable* services and that, in actuality, section 541 *expressly preserves* that authority. Thus, the City concludes, there is neither express preemption nor is there conflict preemption. Without specific, statutory intent to the contrary, the City argues that it is not preempted by federal law from collecting fees on cable modem services. The City asserts that the Agreements reflect defendants' contractual obligation to pay franchise fees on noncable services pursuant to the City's home rule authority as supplemented by the Illinois Municipal Code and the Cable Ordinance. The City urges that the silence of section 542(b) be construed as a savings clause which cannot be deemed a "clear statement of congressional intent" that gives way to preemption. See, *e.g.*, City of Dallas v. Federal Communications Comm'n, 165 F.3d 341, 347-49 (5th Cir. 1999) (Telecommunications Act of 1996 contains no clear statement providing for preemption of local franchising authority over providers of open video system services).

Defendants respond that the federal law prohibits payment of franchise fees on cable modem service in that the FCC conclusively determined that cable modem service does not constitute a "cable service" (FCC Order, pars. 60 through 68 (March 15, 2002)), and that

17

Congress did not intend for the revenue derived from cable modem service to enter the franchise fee base:

> "Cable modem service is an interstate information service within the scope of our jurisdiction over interstate and foreign communications. We recognize, however, that it is provided over the facilities of cable systems that occupy public rights-of-way in local communities. In order to facilitate our national policy goals, we seek to clarify the authority of State and local governments with respect to cable modem service.
>
> * * *
>
> Given that we have found cable modem service to be an information service, revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined." FCC Order, at 4848 par. 96, 4851 par. 105 (March 15, 2002).

Defendants insist that although section 542(a) provides that a "cable operator may be required under the terms of any franchise to pay a franchise fee," any such obligation is "[s]ubject to the limitation of subsection (b)" (47 U.S.C. § 542(a) (2000)). Defendants assert that section 542(b) limits the imposition of franchise fees to 5% of cable service revenue and does not permit franchise fees beyond 5%, including fees on cable modem service revenues. At the same time,

defendants recognize that section 636(c) of the Act (47 U.S.C. §556(c) (2000)) expressly preempts conflicting state and local laws and franchise provisions.[5]

Defendants further argue that the City's position that section 542(b) caps only those revenues derived from cable services, leaving Internet service "fair game" for the imposition of franchise fees, is in contravention of congressional intent. Defendants point to the underlying policy of the 1996 Act to encourage cable operators to provide innovative noncable services.

---

[5]Following oral arguments in this matter, defendants filed a motion to cite additional authority, to wit, a report and order issued by the FCC on March 5, 2007, In re Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992, Report and Order and Further Notice of Proposed Rulemaking, MB Docket No. 05-311, FCC 06-180, at par.1 (March 5, 2007) (Section 621 Order). Defendants argued that the Section 621 Order provides a ruling "on the central issue of this case." In response to defendants' motion, the City correctly observes that the Section 621 Order is not relevant to the issues in the present case. The purpose of the Section 621 Order is to "provide guidance to implement Section 621(a)(1) of the Communications Act [47 U.S.C. § 541(a)(1) (2000)] * * * which prohibits franchising authorities from unreasonably refusing to award competitive franchises for the provision of cable service." Section 621 Order at 2, par. 1. The Section 621 Order established that the franchise-fee authority available under sections 542(a) and (b) provides no basis to collect franchise fees "on revenues from non-cable services." Section 621 Order, 46, par. 98. Because the Renewal Agreements do not rely on federal law to impose "cable service fees" on cable modem service, the Section 621 Order is not relevant to this case.

Defendants cite to the United States House of Representatives conference report, which states that Congress adopted the amendment to clarify that the "franchise fee provision is not intended to reach revenues that a cable operator derives for providing new telecommunications services over its system," and that fees should be imposed on "only the operators['] cable-related revenues." H.R. Conf. Rep. 104-458 at 180 (1996), Pub. L. No. 104-104, §303 (b), 110 stat. 125 (1996).

In its Declaratory Ruling, the FCC stated: "[R]evenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined." FCC Declaratory Ruling, 17 F.C.C.R. 4851, at par 105. Thus, while The City is limited to collecting franchise fees in the amount of 5% based on defendants' gross cable television service revenues by its own Cable Ordinance, the FCC has set forth no stated limit on the franchise fee the City can collect on revenues generated from cable modem service. The legislative history of the Communications Act, including the 1996 Act, reflects no specific intent to preempt franchise fees on noncable services. However, the record here shows that because (1) the Cable Ordinance clearly covers "Auxiliary Services," (2) the Cable Ordinance is incorporated into the Agreements, and (3) the Agreements cap fees at 5%, payment of 5% franchise fees on all services provided was both contemplated by the parties and accepted by the parties upon entering into the Agreement.

Defendants' further reliance on the rulings of four federal district courts, holding that the "plain language" of section 542(b) precludes municipalities from imposing franchise fees on revenue derived from cable modem service, is unavailing. See Parish of Jefferson v. Cox Communications Louisiana, L.L.C., No. 02-3344 (E.D. La. July 3, 2003); City of Chicago v. AT&T Broadband, Inc.,, No. 02-C-7517 (N.D. Ill. September 4, 2003), *vacated on other*

20

*grounds sub nom.* City of Chicago v. Comcast Cable Holdings, L.L.C., 384 F.3d 901 (7th Cir. 2004) (Comcast III)*;* Time Warner Cable-Rochester v. City of Rochester, No. 03-CV-6257 (W.D. N.Y. December 12, 2003); City of Minneapolis v. Time Warner Cable, Inc., No. 05-CV-994 (ADM/AJB) (D. Minn. November 10, 2005) (appeal pending in United States Court of Appeals for the Eighth Circuit (No. 05-4424)). Three cases from outside our jurisdiction are neither persuasive nor mandatory authority, as this court is not bound by the holdings of foreign courts. People *ex rel.* City of Chicago v. Hollins, 368 Ill. App. 3d 934, 944 (2006), citing People v. Chandler, 88 Ill. App. 3d 644, 653 (1980).[6]

Nevertheless, The Time Warner Cable-Rochester court observed in *dicta* that "the parties [in that case] agreed that *should there be a change in federal or state law* that would have the effect of nullifying a specific term or condition of the agreement; it shall take effect and the parties agreed to comply with such changes." (Emphasis added.) Time Warner Cable-Rochester, No. 03-CV-6257, slip op. at 42. The Time Warner Cable-Rochester court aptly calls attention to the confusion over the interpretation of the FCC Declaratory Ruling in conjunction with the

---

[6]The opinion in the Time Warner Cable-Rochester case, which is merely a short order accompanied by transcript of oral proceedings, accurately describes the case law on this issue as "sparse," in that the above-described "opinions" are the only authority addressing this subject. Time Warner Cable-Rochester, slip op. at ____. This dearth of authority is evidenced by the fact, noted herein, that the defendants cite the predecessor opinion issued in the present case, Chicago v. AT&T, No. 02-C-7517 (September 4, 2003) (Comcast I), as authority, despite the fact that it was overturned by the Seventh Circuit (Chicago v. Comcast, 384 F.3d 901 (7th Cir. 2004) (Comcast III)).

Communications Act; no such clear change in federal law has yet to occur. Although defendants argue that the Ninth Circuit Court of Appeals affirmed the statement in the FCC's Declaratory Ruling that "cable broadband service" (cable modem service) is not a cable service (Brand X Internet Service v. F.C.C., 345 F.3d 1120, 1132 (9th Cir. 2003)), Brand X did not resolve the matter of applicability of franchise fees to cable modem service. The United States Supreme Court denied *certiorari* on the issue of the meaning of the FCC Declaratory Ruling. Thus, no court ruled on the interplay between the FCC Declaratory Ruling and the Communications Act and entered a definitive order resolving the applicability of franchise fees to cable modem service.

This court does not stand in the shoes of our federal government and cannot amend a federal act. We are, however, in a position to apply our own state law to a valid contractual agreement. In doing so, we conclude that the Agreements are valid contracts under state law and that the Agreements are not preempted by federal law. Even if we overlook the fact that defendants mischaracterized their motion to dismiss, the trial court erred in finding that federal law preempts Illinois and municipal law. We conclude that defendants are in violation of their contractual terms under the Renewal Agreements by nonpayment of franchise fees on cable modem service since April 2002.

### C. Internet Tax Freedom Act.

The City further contends that enforcement of the Agreements does not violate the Internet Tax Freedom Act (ITFA) (47 U.S.C. §151 (2000)). The IFTA originally expired by its own terms on November 1, 2003 (see Pub. L. No. 105-288, §1101 (a)), but the IFTA was amended to extend the moratorium to November 1, 2007 (47 U.S.C. §151 (Supp. 2004)). In its ruling, the trial court indicated that imposition of franchise fees *may* violate the ITFA. The City argues that enforcement of franchise fee provisions of the Agreement does not violate the ITFA

because (1) the franchise fees are not taxes; and (2) even if the franchise fees are a tax, they fall within the statute's grandfather clause.

The ITFA provides as follows:

> "No State or political subdivision thereof may impose any of the following taxes during the period beginning November 1, 2003, and ending November 1, 2007:
>
> (1) Taxes on Internet access.
>
> (2) Multiple or discriminatory taxes on electronic commerce." 47 U.S.C. §151 (Supp. 2004).

The ITFA defines "tax" as "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is not a fee imposed for a specific privilege, service, or benefit conferred." 47 U.S.C. §151 (Supp. 2004). Thus under the plain statutory language, the moratorium applies only to taxes and not fees charged in connection with receipt of a benefit.

The City argues that the moratorium on "newly imposed tax on Internet access" does not apply to the franchise fees in the Agreement because the fees are not a tax but, rather, a contractual compensation for the privilege of using the public ways to operate a franchise. See, *e.g.*, Fiber Optic, 287 Ill. App. 3d at 573-74. Further, the ITFA definition of tax specifically excludes:

> "any franchise fee or similar fee imposed by a State or local franchising authority, pursuant to section 622 or 653 of the Communications Act of 1934 (47 U.S.C. 542, 573), or any other

fee related to obligations [of] telecommunications carriers under the

Communications Act of 1934 (47 U.S.C. 151 *et seq.*)." 47 U.S.C.

(Supp. 2004).

In the alternative, the City argues that the franchise fees fall within the ITFA's grandfather

clause. The moratorium on taxing Internet access excluded taxes that were "generally imposed

and actually enforced prior to October 1, 1998." 47 U.S.C.A. §151 (West Supp. 2006). This

exclusion provided:

> "Section 1101 (a) does not apply to a tax on Internet access
>
> that was generally imposed and actually enforced prior to
>
> October 1, 1998, if, before that date - -
>
> (A) the tax was authorized by statute; and
>
> (B) Either - -
>
> > (i) a provider of Internet access services had a
> >
> > reasonable opportunity to know, by virtue of a rule or other
> >
> > public proclamation made by the appropriate administrative
> >
> > agency of the State or political subdivision thereof, that
> >
> > such agency has interpreted and applied such tax to Internet
> >
> > access services; or
> >
> > (ii) a State or political subdivision thereof generally
> >
> > collected such tax on charges for Internet access. 47
> >
> > U.S.C.A. §1104(a)(1) (West Supp. 2006).

The City asserts that the franchise fees in the Agreement fit within this exception as they are:

(1) authorized both by the Cable Ordinance and the Illinois Municipal Code; (2) imposed pursuant

to franchise agreements that became effective on March 29, 1985 (the Agreement at issue is a renewal of that Agreement), well before October 1, 1998; and (3) defendants were on notice prior to October 1, 1998, that the City's franchise fees would apply to any Internet access revenues defendants derived through the operation of their cable systems.

Defendants respond "[a]lthough it is true that franchise fees are generally not considered taxes," and admit that the ITFA expressly exempts "fee[s] imposed for a specific privilege, service, or benefit conferred" (see 47 U.S.C.A. §1104(a)(1) (West Supp. 2006)), they nevertheless argue that those exemptions do not apply to this case because they were rejected in Comcast III the predecessor case to the present case that was dismissed on appeal to the Seventh Circuit and holds no precedential value. Alternatively, defendants return to their argument that Arlington Heights applies because the City is attempting to "exact rent" for the use of the public right-of-way. Arlington Heights, 156 Ill. 2d at 441 (Freeman, J., specially concurring).

Defendants' arguments are without merit. As noted above, Comcast III has no value to the disposition of this matter as it was overturned. Arlington Heights is distinguishable as that case considered nonlocal services. We find that the franchise fee contemplated in the Agreements is not a tax prohibited by the ITFA.

For the reasons stated herein, we therefore reverse the judgment of the trial court, vacate its order, and remand this matter to the trial court for further action as necessary consistent with the specific matters addressed in this opinion.

Reversed and remanded.

QUINN, P.J., and NEVILLE, J., concur.