Docket Nos. 105342, 105348, 105349 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE CITY OF CHICAGO, Appellee, v. COMCAST CABLE
HOLDINGS, L.L.C., *et al*., Appellants.

*Opinion filed November 20, 2008.*

JUSTICE KILBRIDE delivered the judgment of the court, with
opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Garman,
Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

The City of Chicago filed a complaint against the defendants, all
operators of local cable television systems, in a dispute over cable
franchise fees, seeking declaratory relief. Specifically, the City
alleged the defendants violated their cable franchise renewal
agreements by discontinuing payment of a portion of a 5% franchise
fee required by the agreements. In a joint motion to dismiss, the
defendants argued that the contractual fee provision was preempted
by section 542(b) of the Cable Communications Policy Act of 1984
(Communications Act) (47 U.S.C. §547 (2000)), as interpreted by the
Federal Communications Commission (FCC). The trial court granted

the defendants' motion to dismiss. The appellate court reversed and remanded the cause for further proceedings, concluding there was no clear showing of preemption. 375 Ill. App. 3d 595.

We allowed and consolidated the defendants' petitions for leave to appeal. The central issue is whether the contractual franchise fee provision imposing a 5% fee on defendants' gross cable modem service revenues is preempted by section 542(b) of the Communications Act. If it is preempted, we must consider whether the City has an alternative right to impose that fee under its home-rule authority, as granted by state law. After examining both issues, we reverse the appellate court judgment and affirm the circuit court's dismissal of the City's complaint.


FACTS

In September 2002, the City of Chicago filed a complaint in the circuit court of Cook County against seven defendants providing local services over a cable system. The seven defendants were Comcast Cable Holdings, L.L.C., Comcast of Chicago, Inc., Comcast of Illinois III, Inc., Comcast of South Chicago, Inc., Comcast of Florida/Illinois/Michigan, Inc., RCN Cable TV of Chicago, Inc., and Wideopenwest Illinois, Inc. The complaint sought a declaratory judgment as well as any other just and appropriate relief, including injunctive or equitable relief. The complaint alleged that in March 2002, each of the defendants violated its franchise renewal agreement with the City by refusing to pay the portion of the franchise fee based on the annual gross revenue derived from its provision of cable modem service. Cable modem service uses cable system facilities and equipment to provide Internet access and services to subscribers. *In re Inquiry Concerning High-Speed Access to the Internet Over Cable & Other Facilities*, 17 F.C.C.R. 4798, 4821, ¶38 (FCC March 15, 2002) (FCC Ruling). Previously, each defendant had paid the entire fee requested by the City under section 4.1 of the agreement.

A March 15, 2002, FCC ruling classifying cable modem service as an information service rather than a cable service prompted the defendants' refusal to pay that portion of the franchise fee. See FCC Ruling, 17 F.C.C.R. at 4819, ¶33. They argued that the FCC Ruling excluded revenue from cable modem services from the calculation of

the gross revenues used to set the 5% franchise fee ceiling. FCC Ruling, 17 F.C.C.R. at 4851, ¶105. The defendants allege that the ruling preempted that portion of the franchise fee provision in their renewal agreements with the City, thus eliminating their payment obligation. Because the relevant provisions in each of the franchise renewal agreements are identical, we will refer to them in the singular form throughout our discussion.

The defendants removed the cause of action to federal court and filed a joint motion to dismiss, alleging that the disputed portion of the franchise fee was preempted by the Communications Act (47 U.S.C. §§521 through 573 (2000)) and the Internet Tax Freedom Act (47 U.S.C. §151 note (2000)). The federal district court granted the defendants' motion to dismiss (*City of Chicago v. AT&T Broadband, Inc.*, No. 02–C–7517 (N.D. Ill. September 4, 2003)), and the City appealed. The Seventh Circuit Court of Appeals vacated the federal district court judgment and remanded the cause to the Cook County circuit court, citing lack of federal jurisdiction, without ruling on the merits of the motion to dismiss. *City of Chicago v. Comcast Cable Holdings, L.L.C.*, 384 F.3d 901 (7th Cir. 2004).

In the Cook County circuit court, the defendants again filed a joint motion to dismiss, and the trial court granted the motion, finding that section 542 of the Communications Act preempted the portion of the franchise agreement calculating franchise fees based on gross revenues from cable modem services. The City appealed, and the appellate court reversed the trial court's dismissal order, denying the petition for rehearing filed by Comcast. 375 Ill. App. 3d 595. In approving the agreement's use of cable modem service revenues in the calculation of the franchise fee, the appellate court found that the City's home-rule authority was not preempted by section 542 and concluded that the franchise agreement did not violate the Internet Tax Freedom Act. 375 Ill. App. 3d 595. The defendants filed petitions for leave to appeal under Supreme Court Rule 315 (210 Ill. 2d R. 315), and this court allowed and consolidated the petitions.

ANALYSIS
I. Section 542(b) Preemption

At the heart of the parties' dispute is whether section 542(b) of the Communications Act (47 U.S.C. §542(b) (2000)) preempts the City's franchise fee because it relies, in part, on revenues from cable modem services. Under the FCC's 2002 ruling, franchise fees may be based only on gross revenues from cable services, excluding cable modem service revenues from its calculation.

While preemption may not be presumed, three distinct types of preemption are recognized: (1) express preemption, shown by a clear expression of congressional intent to preempt state law; (2) field preemption, shown by comprehensive legislation demonstrating a clear congressional intent to occupy the entire regulatory field; and (3) conflict preemption, shown by a conflict between state and federal law. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 150 L. Ed. 2d 532, 550, 121 S. Ct. 2404, 2414 (2001). Because federal preemption presents a question of law, it is subject to *de novo* review. *Kinkel v. Cingular Wireless, LLC*, 223 Ill. 2d 1, 15 (2006). Similarly, appellate review of an order granting a motion to dismiss is *de novo*. *Karas v. Strevell*, 227 Ill. 2d 440, 451 (2008).

Here, the defendants argue that the portion of the franchise fee based on revenues from cable modem services is subject to a finding of both express and conflict preemption. The "ultimate touchstone" of our preemption analysis must be the intent of Congress. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 120 L. Ed. 2d 407, 422, 112 S. Ct. 2608, 2617 (1992). To aid in determining that intent, we examine the legal developments leading to the FCC's 2002 declaratory ruling underlying the defendants' decision to terminate their payment of the disputed fees.

A. *The Development of Section 542(b)*

In 1972, the FCC capped local cable franchise fees due to concerns that:

> "many local authorities appear to have extracted high franchise fees more for revenue-raising than for regulatory purposes. Most fees are about five or six percent, but some have been known to run as high as 36 percent. The ultimate effect of any revenue-raising fee is to levy an indirect and regressive tax on cable subscribers." *In re Amendment of Part*

*74, Subpart K, of the Commission's Rules and Regulations Relative to Community Antenna Television Systems*, Cable Television Report & Order, 36 F.C.C.2d 143, at ¶¶171, 185 (FCC February 3, 1972) (*Community Antenna Television Systems*).

The FCC set the franchise fee cap at 5% and preempted provisions in franchise agreements imposing higher fees. *Community Antenna Television Systems,* 36 F.C.C.2d 143, at ¶186.

In 1985, Congress codified the FCC's regulatory scheme in Title VI of the earlier Federal Communications Act of 1934. See Communications Act, Pub. L. No. 98–549, 98 Stat. 2779 (October 30, 1984) (effective 60 days after enactment, 98 Stat. 2806). These enactments included a franchise fee cap in section 542(b), providing that:

> "For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed five percent of such cable operator's gross revenues derived in such period from the operation of the cable system." 47 U.S.C. §542(b) (Supp. 1984).

By codifying the FCC's regulatory scheme, Congress adopted the FCC's underlying purpose and rationale, in the absence of any contrary showing. Thus, the changes expressed congressional concern over the misuse of franchise fees for revenue-raising purposes because excessive fees effectively created a regressive, indirect tax on subscribers. *Community Antenna Television Systems*, 36 F.C.C.2d 143, at ¶¶171, 185.

Congress again amended the Communications Act in 1996, encouraging cable operators to employ technological advances and provide new services. Although Congress did not alter the amount of the franchise fee cap, it added language limiting the collection of the 5% fees to a "cable operator's gross revenues derived *** from the operation of the cable system *to provide cable services*." (Emphasis added.) Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996). Before the 1996 amendments, the gross revenues from any cable system operation could be used to calculate the franchise fee, capping that fee at 5%. After the amendment, however, the fee could be based on only revenues from cable system operations

providing "cable services." Thus, the 1996 amendment expressed a congressional intent to limit the scope of the revenues that could be used to calculate franchise fees.

After cable modem service became available to provide faster Internet access in 1998, local cable franchising authorities also began imposing the same 5% franchise fees on those revenues. In response, the FCC used its regulatory powers to restrict further the revenues included in calculating the 5% franchise fee ceiling. On March 15, 2002, the FCC interpreted Congress' 1996 amendment to section 542(b) limiting the cable franchise fees to 5% of a "cable operator's gross revenues derived *** from the cable operation of the cable system to provide *cable services*." (Emphasis added.) Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (1996). In its ruling, the FCC stated that "*cable modem service* as currently provided is an interstate information service, *not a cable service*." (Emphases added.) FCC Ruling, 17 F.C.C.R. at 4819, ¶33. The FCC concluded: "[g]iven that we have found cable modem service to be an information service, *revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined*." (Emphasis added.) FCC Ruling, 17 F.C.C.R. at 4851, ¶105.

The United States Supreme Court upheld that ruling as decisive and entitled to deference in *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 999-1000, 162 L. Ed. 2d 820, 849-50, 125 S. Ct. 2688, 2709-10 (2005), but did not independently rule on its meaning. The parties in this case do not dispute the validity of the FCC Ruling and do not rely on *Brand X* in arguing the substantive issues in this appeal. The parties' focus is the FCC's 2002 ruling forming the basis for the defendants' argument that the franchise fee provision in their agreement with the City is preempted by federal law.


B. *Franchise Renewal Agreement Provisions*

In its complaint, the City alleges that the defendants violated section 4.1 of the franchise renewal agreement, entitled "Franchise Fee." That section states:

"[p]ursuant to Section 4–280–170(A) and (B) of the Cable Ordinance, the [franchisee] shall pay to the City *a franchise fee* of five percent (5%) of the annual gross revenues received by the [franchisee] during the period of its operation under this Agreement." (Emphasis added.)

This language expressly requires the franchisee to pay a single franchise fee of 5% of its yearly gross revenues. The agreement does not, however, define the key phrase "gross revenues." Instead, it states that "all terms, phrases, words or their derivations shall be defined as set forth in Section 4–280–030 of the Cable Ordinance" whenever possible, "[u]nless the context clearly indicates that a different meaning is intended."

In the Chicago Cable Communications Ordinance, section 4–280–030(N) defines "[g]ross revenues" as "revenue derived directly or indirectly from the operation or use of all or part of a cable television system *** including, but not limited to, revenue from *regular subscriber service fees, [and] auxiliary service fees*." (Emphasis added.) Chicago Municipal Code §4–280–030(N) (2001). " 'Regular subscriber service' means the distribution to subscribers of signals over the cable television system on all channels *except *** those intended for reception by equipment other than a television broadcast receiver*." (Emphasis added.) Chicago Municipal Code §4–280–030(T) (2001). Because cable modem service is not intended to be received by a television broadcast receiver, it is not a "regular subscriber service," and the parties do not argue that it falls within that category. Accordingly, fees from cable modem service are not regular subscriber service revenues included in the franchisee's annual gross revenues used to calculate its section 4.1 franchise fees.

Section 4–280–030(N)'s definition of "[g]ross revenues," however, also includes revenue from auxiliary services. Chicago Municipal Code §4–280–030(N) (2001). Section 4–280–030(A) of the Cable Ordinance defines "[a]uxiliary services" as:

"any communications services in addition to 'regular subscriber services' including, but not limited to *** data or other electronic transmission services, *** home shopping services, interactive two-way services and *any other service utilizing any facility or equipment of a cable television system*

operating pursuant to a franchise granted under this chapter." (Emphasis added.) Chicago Municipal Code §4–280–030(A) (2001).

Applying this definition, cable modem service revenues would constitute "auxiliary service fees" because cable modem service falls within the Cable Ordinance's broad classification of an "auxiliary service" as "any other service" using any cable system facilities or equipment. Thus, under the terms of the parties' agreement and the Cable Ordinance, revenue from cable modem services is included in the annual gross revenues used to calculate the franchise fees due under section 4.1.

Two other Cable Ordinance provisions are also relevant to this dispute. The agreement provides that "[t]he terms and conditions set forth in *** Section 4 are pursuant to the terms and conditions set forth in Sections 4–280–050(C) and 4–280–170 of the Cable Ordinance." Section 4–280–050(C) discusses the required fees in the franchise approval process and therefore is not relevant to the issues presented in this appeal. Chicago Municipal Code §4–280–050(C) (2001). Section 4–280–170 is relevant, however, because its paragraph A mandates that a franchisee "pay to the city *a franchise fee* of not less than five percent of its annual gross revenues during the period of its operation under the franchise." (Emphasis added.) Chicago Municipal Code §4–280–170(A) (1993). Thus, both the language of section 4.1 and section 4–280–170(A) of the Cable Ordinance authorizes the imposition of a 5% single franchise fee. Section 4 then specifies the details of that one franchise fee. Notably, the agreement expressly states all terms and conditions in both section 4 and section 4–280–170 are to be understood "as interpreted and applied in accordance with Section 542 of the Communications Act." Therefore, we next examine section 542 and its interaction with section 4 of the parties' agreement.

C. *The Interplay of Section 4 of the Agreement and Section 542*

The language of the section 542 of the Communications Act is at the core of the parties' arguments. Section 542 states, in relevant part:

"(a) Payment under terms of franchise

Subject to the limitation of subsection (b) of this section, any cable operator may be required under the terms of any franchise to pay *a franchise fee*.

(b) Amount of fees per annum

For any twelve-month period, the franchise fees paid by a cable operator *with respect to any cable system* shall not exceed 5 percent of such cable operator's *gross revenues* derived in such period *from the operation of the cable system to provide cable services*."

"(g) 'Franchise fee' defined

For the purposes of this section–

(1) the term 'franchise fee' includes any tax, fee, or assessment *of any kind* imposed by a franchising authority or other governmental entity on a cable operator ***, *solely because of their status as such*[.]" (Emphases added.) 47 U.S.C. §§542(a), (b), (g)(1) (2000).

Consistent with the language in section 4.1 of the parties' agreement and section 4–280–170(A) of the Cable Ordinance, section 542 permits the imposition of *a single franchise fee* on a cable operator. Both section 542(b) and section 4.1 also limit this fee to 5% of the cable operator's yearly gross revenues. The Communication Act and the agreement diverge, however, on the types of "gross revenues" used to calculate the 5% fee ceiling.

Section 542(b) of the Communications Act limits the franchise fee to 5% of the cable operator's gross revenues "derived *** from the operation of the cable system to provide cable services." 47 U.S.C. §542(b) (2000). Under the FCC's March 15, 2002, ruling, however, "*revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined*." (Emphasis added.) FCC Ruling, 17 F.C.C.R. at 4851, ¶105. Stated another way, the FCC's ruling means that the franchise fee imposed on cable operators is limited to 5% of their gross cable service revenues, but may not include gross revenues from cable modem services. That limitation is in direct conflict with the City's attempt to impose a franchise fee on cable modem service revenues under section 4.1 of the parties' agreement.

As noted, the agreement's definition of the "gross revenues" used to calculate the franchise fee incorporates revenues from both "regular subscriber service" and "auxiliary service," including cable modem service. The FCC's 2002 ruling excluding cable modem revenues from the calculation of gross revenues preempts the agreement's inclusion of those revenues in the calculation of the City's 5% franchise fee. See FCC Ruling, 17 F.C.C.R. at 4851, ¶105. See also *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541, 150 L. Ed. 2d 532, 550, 121 S. Ct. 2404, 2414 (2001).

Section 556(c) of the Communications Act also supports our legal conclusion that the franchise fee provisions are preempted. It expressly states that "any provision of law of any *** franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded." 47 U.S.C. §556(c) (2000). Indeed, even section 29.1 of the parties' agreement provides that "[t]his Agreement shall be construed pursuant to the laws of the State of Illinois *unless otherwise preempted by Federal law*." (Emphasis added.) Here, the disputed portion of the parties' agreement is preempted.

Despite the differences between the language in portions of the agreement on franchise fees and the Communications Act, the City argues that section 542 does not apply to its franchise fee because that section affects fees imposed "solely because" an operator provides cable services. See 47 U.S.C. §542(g)(1) (2000). The City asserts that the disputed fees are imposed because the cable operator provides "cable modem services," not "cable services." See FCC Ruling, 17 F.C.C.R. at 4819, ¶33. Therefore, the fees derived from cable modem service revenues are not "franchise fees" under the definition in section 542(g)(1) and cannot be limited by section 542(b)'s 5% ceiling on franchise fees. Accordingly, the City maintains that section 542 does not apply to the fee imposed by the agreement. Because section 542 does not apply, it cannot preempt the agreement's franchise fee provision.

We reject the City's contention because it relies on a misstatement of section 542(g). The City contends section 542 and its fee cap do not apply because the fees are not imposed "solely because" the cable operator provides *cable services*. This argument ignores the plain

language of the statute, our best indicator of legislative intent (*Hennings v. Chandler*, 229 Ill. 2d 18, 24 (2008)). In deciding preemption questions, the intent of Congress continues to be the "ultimate touchstone" of our analysis. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 120 L. Ed. 2d 407, 422, 112 S. Ct. 2608, 2617 (1992).

Under the plain language of section 542(g), the key question is not whether "cable services" are provided by a cable operator, as the City contends, but whether the franchise fee is "imposed \*\*\* on a cable operator \*\*\*, *solely because of their status as such*." (Emphasis added.) 47 U.S.C. §542(g)(1) (2000). The City's argument is unpersuasive because it is not based on the statutory language enacted by Congress. Instead, the City supports its argument that section 542 does not apply to the fee imposed on cable modem service revenues by changing the statutory language to require the relevant fee to be imposed "solely because" the cable operator provides "cable services." There is no basis in the statute to support that claim. Plainly stated, section 542 does not read as argued by the City. Therefore, we reject the City's argument that section 542 applies only to fees imposed solely because the cable operator provides cable services as inconsistent with the actual language of section 542(g)(1). Because the City has failed to establish that the plain language of section 542(g)(1) supports its contention that the disputed fees are not "franchise fees," it lacks any basis for the remainder of its argument addressing the applicability of section 542(b).

The City next relies on the "savings clause" in section 541(d)(2) of the Communications Act to justify the franchise fee imposed in the parties' agreement. Under this section,

> "Nothing in this subchapter shall be construed to affect the authority of any State to regulate any cable operator to the extent that such operator provides *any communication service other than cable service \*\*\**." (Emphasis added.) 47 U.S.C. §541(d)(2) (2000).

The City argues that this section permits it to regulate the defendants with the franchise fee "because they provide a service other than cable service."

Again, the City's argument lacks roots in the plain language of the statute. The City does not argue that the defendants provide "any communication service," as required by the statute, just that they provide a noncable service. The City also does not argue that the cable modem services provided by the defendants are a "communication service" under the language of its agreement. Consequently, it provides no basis, statutory or contractual, for this court to conclude that cable modem service constitutes a "communication service" within the meaning of section 541(d)(2) of the parties' agreement. Indeed, the FCC's 2002 ruling classified cable modem service as "an interstate information service," not as a "communication service." See FCC Ruling, 17 F.C.C.R. at 4819, ¶33. We find the City's "savings clause" argument unpersuasive.

Next, the City asserts that the federal court decisions cited by the defendants are unpersuasive and do not address its primary argument, namely, that section 542 does not apply because the fee imposed does not fall within section 542(g)(1)'s definition of a "franchise fee." We have already rejected the City's unique substantive argument due to its failure to comport with the plain language of the statute. We must, however, consider whether our decision is consistent with the case law cited by the defendants. See *Parish of Jefferson v. Cox Communications Louisiana, LLC*, No. 02–334 (E.D. La. July 3, 2003); *Time Warner Cable-Rochester v. City of Rochester*, No. 03–CV–6257 (W.D.N.Y. December 12, 2003); *City of Minneapolis v. Time Warner Cable, Inc.*, No. 05–994 (D. Minn. November 10, 2005). As this court's decisions have stated, we look to nonbinding federal law as persuasive authority when construing federal statutes due to the importance of maintaining uniform interpretations. *Bowman v. American River Transportation Co.*, 217 Ill. 2d 75, 91 (2005).

In *Parish of Jefferson*, the federal district court held that the FCC Ruling was reasonable and, by its terms, preempted any franchise fee on revenues from cable modem services. The court granted the defendants' partial motion to dismiss on preemption grounds because, under the FCC Ruling, revenues from cable modem services were excluded from the gross annual revenues used to calculate the 5% franchise fee ceiling in section 542(b). *Parish of Jefferson v. Cox Communications Louisiana, LLC*, No. 02–334.

-12-

The court in *Time Warner Cable-Rochester* granted the cable operator's motion for summary judgment, rejecting the City of Rochester's argument that section 542(b)'s fee cap applies to franchise fees only on cable services, not on cable modem service revenues. The court noted that Rochester had not cited any supporting case law and concluded that adopting the city's position would be contrary to congressional intent. In examining congressional intent, the court looked to the relevant legislative history and the FCC's policy rationale for implementing a fee cap, namely, to avoid creating a regressive and indirect tax on cable subscribers. The court also cited *Parish of Jefferson* with approval. After noting that the Communications Act specifically preempts any franchise agreement provision inconsistent with federal law, the court found the agreement in that case to be preempted. *Time Warner Cable-Rochester*, No. 03–CV–6257.

Finally, in *Time Warner Cable*, the franchise agreement required the cable operators to pay a "franchise fee of five (5) per cent of the company's gross annual revenues," with "gross annual revenues" defined as "all revenue derived directly or indirectly *** from or in connection with the operation of the cable communications system." *Time Warner Cable*, No. 05–994. The cable operators argued that application of this provision to revenues from cable modem services was preempted by the Communications Act. Relying on section 542(b), the City of Minneapolis argued that the Communications Act governed franchise fees on only cable services, while cable modem services were governed under a separate title.

In rejecting the city's argument, the court noted that section 542(g)(1) so broadly defined a "franchise fee" that it included "a fee of virtually any kind targeting cable providers." *Time Warner Cable*, No. 05–994. To adopt Minneapolis' interpretation would create "an end run around preemption" that is precluded by the FCC Ruling that "cable modem service revenues are not to be included in the assessment of franchise fees." *Time Warner Cable*, No. 05–994. Therefore, the court granted the cable operators' motion to dismiss that count of the complaint.

All the federal district courts cited in this appeal have found that, in accordance with the FCC's 2002 ruling, section 542 preempts the

franchise fee provisions that include cable modem service revenues. Thus, based on our independent analysis, and consistent with the weight of federal authority, we conclude the FCC's interpretation of section 542 preempts the franchise fee provisions in the parties' agreement. See *U.S. Bank National Ass'n v. Clark*, 216 Ill. 2d 334, 352 (2005). Accordingly, we need not address the defendants' alternative argument that the franchise fee violates the Internet Tax Freedom Act (47 U.S.C. §151 note (2000)).

### D. *The City's Home-Rule Argument*

Finally, the City asserts that the FCC Ruling can affect only its federal authority to impose franchise fees derived from cable modem service revenues and that it may continue to impose those fees under its independent state law franchising authority and section 541(d)(2)'s savings clause. We have already rejected the City's savings clause argument as unpersuasive and need not further address that issue. As for its reliance on the state law authority inherent in its home-rule powers, the City fails to cite any provision in the agreement, except section 4, permitting the imposition of franchise fees on cable modem revenues. Next, we examine the language in section 4 to determine whether it supports the City's imposition of a fee based on cable modem service revenues.

Section 4 expressly states the "terms and conditions set forth in this [section] are pursuant to the terms and conditions set forth in *** [section] 4–280–170 of the Cable *Ordinance as interpreted and applied in accordance with Section 542 of the Communications Act*." (Emphasis added.) Section 4–280–170(A) requires the franchisee to pay "*a franchise fee* of not less than five percent of its annual gross revenues." (Emphasis added.) Chicago Municipal Code §4–280–170(A) (1993). Similarly, section 4.1 requires the franchisee to pay "*a franchise fee* of five percent (5%) of the annual gross revenues" it receives. (Emphasis added.) Thus, both the language of section 4.1 and section 4–280–170(A) of the Cable Ordinance authorize the imposition of *a single franchise fee* of 5% of the franchisee's annual gross revenues. In addition, the agreement expressly conditions the subject matter of that sole franchise fee *on its interpretation and application in section 542*. As we have

-14-

concluded in our discussion of section 542, the franchise fees imposed cannot be derived from cable modem revenues.

Thus, in the absence of a separate, specifically cited section in the agreement authorizing the imposition of a 5% fee on a franchisee's cable modem service revenues, there is no contractual basis for the fees sought by the City. Without a contract provision imposing that separate fee, the City has no authority, home rule or otherwise, to require the defendants to pay the fee at issue in this appeal.

## II. CONCLUSION

We hold that the FCC's 2002 ruling that "revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined" (FCC Ruling, 17 F.C.C.R. at 4851, ¶105) preempts the portion of the parties' agreement the City relies on to impose a 5% franchise fee on the cable operators' cable modem service revenues. Accordingly, the trial court properly granted the defendants' joint motion to dismiss based on a finding of preemption, and the appellate court erred in reversing the dismissal order and remanding the cause for further proceedings.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*