**COMCAST CABLE OF PLANO, INC., Appellant,**

v.

**CITY OF PLANO, Texas, Appellee.**

**No. 05–09–00754–CV.**

Court of Appeals of Texas, Dallas.

June 24, 2010.

Elizann Carroll, Richard Law Group, Dallas, TX, Robert G. Scott, Davis, Wright, Tremaine, LLP, Washington, DC, for Appellant.

William David Dunn, Sheryl Kao, Gardere, Wynne, Sewell, LLP, Dallas, TX, Stacy R. Obenhaus, Houston, TX, for Appellee.

Before Justices FITZGERALD, MURPHY, and MYERS.

## OPINION

Opinion By Justice FITZGERALD.

The City of Plano sued Comcast Cable of Plano, Inc. for franchise fees allegedly due under a franchise agreement. Comcast moved for summary judgment based on federal preemption. The trial court denied Comcast's motion, and it subsequently granted the parties' joint motion to permit an interlocutory appeal of its summary-judgment ruling. The parties have agreed to a single issue on appeal:

> Does the Federal Communications Act, 47 U.S.C. §§ 542(b) and 556(c), preempt the City's claim that its July 11, 1983 Franchise Agreement with Comcast entitled the City to receive a fee equal to five percent of Comcast's annual reve-

nues attributable to the provision of cable modem service (high speed access to the Internet) within the confines of the City?

We conclude that federal law preempts the City's claim based on the Franchise Agreement, so we reverse the order denying Comcast's motion for summary judgment, render judgment that the City take nothing on its claim for breach of the Agreement, and remand for further proceedings on the City's remaining claims consistent with this opinion.

## I. BACKGROUND

### A. Facts

In June 2002, Comcast acquired the cable system in the City of Plano from AT & T Broadband, and it assumed AT & T's rights and obligations under an existing Franchise Agreement with the City. The Agreement is also a City ordinance, ordinance 83–7–8, which the City originally adopted in 1983. The City approved AT & T's assignment of the Agreement to Comcast in June 2002, and Comcast owned and operated the cable system from June 2002 to the end of July 2006. Comcast assigned its rights in the Agreement to Time Warner Cable effective August 1, 2006.

The Agreement authorizes the grantee to use public rights of way to operate and maintain a "cable communications system" for the sale of cable services to City residents. The Agreement defines "cable communications system" as a system for, among other things, the distribution of "audio, video and other forms of electronic or electrical signals." The grantee under the Agreement must pay the City a franchise fee "equal to five percent (5%) of Grantee's gross annual revenue from all sources attributable to the operations of the Grantee within the confines of the City of Plano." The Agreement defines "gross revenue" as all consideration received by the grantee "arising from or attributable to the sale or exchange of cable communications services by Grantee within the City or in any way derived from the operation of its system," excluding taxes collected by the grantee on behalf of a governmental unit.

When Comcast stepped into AT & T's shoes in June 2002, AT & T had already begun to offer its customers cable modem service—i.e., internet access—through its cable communications system, in addition to traditional cable television service. AT & T paid the 5% franchise fee on its cable-modem-service revenues until March 2002. It stopped paying the fee on those revenues after the FCC released a "Declaratory Ruling and Notice of Proposed Rulemaking" on March 15, 2002. AT & T took the position that the Federal Communications Act of 1934, as interpreted by the FCC, made it illegal for the City to charge any franchise fee on revenues AT & T derived from the provision of cable modem services. The City disagreed and demanded that AT & T pay franchise fees on its cable-modem-service revenues. AT & T refused to pay, and Comcast continued AT & T's policy of refusing to pay franchise fees on cable-modem-service revenues after it took over the franchise in June 2002. The record reflects that Comcast collected almost $56 million in gross revenue from providing cable modem services within the City on which it has not paid any franchise fees.

### B. Procedural history

The City sued Comcast in February 2003, alleging breach of the Agreement and alternatively breach of implied contract, quantum meruit, unjust enrichment, and trespass. The case was abated for several years. After the abatement ended, Comcast moved for summary judgment on the entire case based on federal preemp-

tion under the Communications Act. The trial court denied the motion. The parties then filed a joint motion for an order authorizing an interlocutory appeal of the summary-judgment order. The trial court granted that motion and stayed all proceedings in the case pending the outcome of the appeal. Comcast timely filed its notice of appeal. The parties' agreed issue on appeal represents a controlling question of law as to which there is a substantial ground for difference of opinion, and our resolution of it may materially advance the ultimate termination of this litigation, so we have jurisdiction pursuant to section 51.014(d) of the civil practice and remedies code. *See generally State Fair of Tex. v. Iron Mountain Info. Mgmt., Inc.,* 299 S.W.3d 261 (Tex.App.-Dallas 2009, no pet.) (dismissing appeal for failure to comply with section 51.014(d)).

## II. Standard of Review

We review an appealable order denying a motion for summary judgment de novo. *Gaylord Broad. Co., L.P. v. Francis,* 7 S.W.3d 279, 283 (Tex.App.-Dallas 1999, pet. denied). Federal preemption is an affirmative defense. *Whitten v. Vehicle Removal Corp.,* 56 S.W.3d 293, 298 (Tex. App.-Dallas 2001, pet. denied). A party seeking summary judgment based on an affirmative defense must prove that defense with conclusive evidence. *Dallas Cent. Appraisal Dist. v. Mission Aire IV, L.P.,* 279 S.W.3d 471, 474 (Tex.App.-Dallas 2009, pet. denied). "A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence." *W.H.V., Inc. v. Assocs. Hous. Fin., LLC,* 43 S.W.3d 83, 87 (Tex.App.-Dallas 2001, pet. denied). In conducting our review, we must take evidence favorable to the nonmovant as true, and we must indulge every reasonable inference and resolve every doubt in favor of the nonmovant. *Smith v. Deneve,* 285 S.W.3d 904, 909 (Tex.App.-Dallas 2009, no pet.).

Statutory construction is a legal issue reviewed de novo. *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625 (Tex.2008).

## III. Analysis

Comcast argues that federal law forbids municipalities from charging cable-system operators a franchise fee for furnishing cable modem services through a cable system, and that the Agreement conflicts with that federal law to the extent it requires payment of such a fee. We agree.

### A. Background: Preemption and the federal regulatory scheme

#### 1. The law of preemption

■ The Texas Supreme Court summarized the principles of federal preemption in *BIC Pen Corp. v. Carter,* 251 S.W.3d 500 (Tex.2008). When a state law conflicts with a federal law, it is preempted and has no effect. Preemption can be express or implied. Express preemption occurs when a federal law expressly preempts state law. Implied preemption occurs when a federal law's scope indicates that Congress intended for federal law or regulations to occupy the field exclusively. Implied preemption also occurs when a state law actually conflicts with a federal law or regulation, either because (1) it is impossible for a private party to comply with both state and federal law, or (2) the state law obstructs the accomplishment and execution of Congress's full purposes and objectives. *Id.* at 504. This case involves conflict preemption.

■ A preemption analysis is an inquiry into congressional intent. *See Delta Air Lines, Inc. v. Black,* 116 S.W.3d 745, 748 (Tex.2003). We assume that Congress did not intend to supersede the historic

police powers of the states unless its intent to do so is clear and manifest. *Whitten,* 56 S.W.3d at 300. To ascertain Congress's intent, we look first to its chosen language. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). We assume that the ordinary meaning of the language accurately expresses the legislative purpose. *Id.* We also consider the structure and purpose of the statute as a whole, as revealed by both the statutory text and our "reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 486, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *see also Delta Air Lines, Inc.,* 116 S.W.3d at 748 ("Congressional intent is discerned primarily from the statute's language and structure."). This case involves the congressional intent underlying an amendment to a preexisting statute, so we must also be mindful that when "Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Pierce County, Wash. v. Guillen,* 537 U.S. 129, 145, 123 S.Ct. 720, 154 L.Ed.2d 610 (2003) (internal quotations omitted).

### 2. The federal regulatory scheme

Several courts have already described the historical development of the federal regulatory scheme in question. *See, e.g., City of Chicago v. Comcast Cable Holdings, L.L.C.,* 231 Ill.2d 399, 326 Ill.Dec. 620, 900 N.E.2d 256, 259–60 (2008); *City of Minneapolis v. Time Warner Cable, Inc.,* No. Civ.05–994 ADM/AJB, 2005 WL 3036645, at *1 (D.Minn. Nov. 10, 2005). The first step in that development was the FCC's 1972 order capping cable television franchise fees at 5%, based on the agency's concern that local authorities were in effect imposing excessive taxes on cable subscribers. *Comcast Cable Holdings, L.L.C.,*

900 N.E.2d at 259. Congress enacted that 5% cap as a statute in § 622 of the Cable Communications Policy Act of 1984, which was itself an amendment of the Federal Communications Act of 1934. In § 622 (codified at 47 U.S.C. § 542), Congress expressly authorized the charging of franchise fees as follows: "Subject to the limits of subsection (b) of this section, any cable operator may be required under the terms of any franchise to pay a franchise fee." 47 U.S.C.A. § 542(a) (West 2001). Congress simultaneously adopted the 5% cap on those fees:

> For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system.

Pub.L. No. 98–549, 98 Stat. 2779 (codified as amended at 47 U.S.C. § 542(b)). The 1984 amendment also added an express preemption provision to the Communications Act:

> Except as provided in section 557 of this title, any provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded.

47 U.S.C.A. § 556(c) (West 2001). In the Telecommunications Act of 1996, Congress amended § 542(b) to its present form by adding a new four-word phrase at the end:

> For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system *to provide cable services.*

47 U.S.C.A. § 542(b) (West 2001) (emphasis added).

On March 15, 2002, the FCC issued a "Declaratory Ruling and Notice of Proposed Rulemaking" in which it concluded that "cable modem service as currently provided is an interstate information service, not a cable service" for purposes of regulation under the Federal Communications Act of 1934. *In re Inquiry Concerning High–Speed Access to the Internet Over Cable and Other Facilities,* 17 F.C.C.R. 4798, 4819, at ¶ 33 (2002) (cited hereinafter as "2002 Declaratory Ruling"). The FCC recognized that its decision might interact with § 542(b) to prohibit franchising authorities from collecting franchise fees on cable modem service:

> Given that we have found cable modem service to be an information service, revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined. Furthermore, we tentatively conclude that Title VI [47 U.S.C. §§ 601–39] does not provide an independent basis of authority for assessing franchise fees on cable modem service. We seek comment on this issue.

*Id.* at 4851, ¶ 105. Although the Supreme Court later affirmed the 2002 Declaratory Ruling, it did so without specifically addressing or approving the FCC's conclusion that cable modem service is not a "cable service" under the Communications Act. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). In March 2007, the FCC released a report, order, and further notice of proposed rulemaking that purported to restate its conclusion in the 2002 Declaratory Ruling more clearly and emphatically:

> We clarify that a cable operator is not required to pay franchise fees on revenues from non-cable services.... The Commission determined in the *Cable Modem Declaratory Ruling* that a franchise authority may not assess franchise fees on non-cable services, such as cable modem service, stating that "revenue from cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined." Although this decision related specifically to Internet access service revenues, the same would be true for other "non-cable" service revenues. Thus, Internet access services, including broadband data services, and any other non-cable services are not subject to "cable services" fees.

*In re Implementation of Section 621(a)(1) of the Cable Commc'ns Policy Act of 1984 as amended by the Cable Television Consumer Prot. and Competition Act of 1992,* 22 F.C.C.R. 5101, 5146–47, ¶ 98 (2007) (footnotes omitted).

The 2002 Declaratory Ruling sparked several lawsuits like the one before us. Every jurisdiction that has considered the issue has held that § 542(b) bars governmental units from collecting franchise fees on revenues that cable system operators generate by providing cable modem services. *See Comcast Cable Holdings, L.L.C.,* 900 N.E.2d at 266; *Time Warner Cable, Inc.,* 2005 WL 3036645, at *5–6; *City of Chicago v. AT & T Broadband, Inc.,* No. 02–C–7517, 2003 WL 22057905, at *6 (N.D.Ill. Sept. 4, 2003), *vacated on jurisdictional grounds,* 384 F.3d 901 (7th Cir.2004); *Parish of Jefferson v. Cox Commc'ns La., LLC,* No. 02–3344, 2003 WL 21634440, at *4–8 (E.D.La. July 3, 2003). Of course, these decisions are persuasive authority only, and we must ultimately decide the correct interpretation of § 542(b) for ourselves. *See Roehrs v. FSI Holdings, Inc.,* 246 S.W.3d 796, 803 (Tex. App.-Dallas 2008, pet. denied) ("On issues

of federal law, ... we must follow the decisions of the United States Supreme Court and the Texas Supreme Court; the decisions of other federal courts, by contrast, may be persuasive but are not binding on us.").

## B. Application of the law to the facts

### 1. Preemption analysis

█ Comcast argues that § 542(b) as amended in 1996 preempts the City's claim under the Agreement. The amended statute, which is still in effect, reads:

> For any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system *to provide cable services.*

47 U.S.C.A. § 542(b) (emphasis added). The plain meaning of the amended statute is that the maximum fee a franchising authority may charge a cable operator with respect to its cable system is 5% of the gross revenues derived from the provision of "cable services" over the cable system. If the cable operator generates additional revenue by providing any other kind of services over its cable system, the additional revenue may not be included in the calculation of the maximum franchise fee.

We conclude that § 542(b) unambiguously prohibits the City from charging Comcast any franchise fee on revenues generated from services that are furnished over its cable system and are not "cable services." We further conclude that this prohibition conflicts with and preempts the parties' Agreement to the extent it requires Comcast to pay a franchise fee on such revenues.

The remaining question is whether cable modem services are "cable services" within the meaning of § 542(b). The statute de-

fines "cable service" as "(A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service." 47 U.S.C.A. § 522(6) (West 2001). The statute provides a separate definition for "information service," 47 U.S.C.A. § 153(20) (West 2001), indicating that the two kinds of service are distinct. The FCC has concluded that cable modem service is an "information service" and not a "cable service." *2002 Declaratory Ruling,* 17 F.C.C.R. at 4819, ¶ 33. Indeed, in its brief, the City agrees that "[c]able modem service is an information service, not a cable service." (Emphases omitted.) Accordingly, we hold that § 542(b) preempts and bars the City's claim under the Agreement for any franchise fees on revenue attributable to Comcast's provision of cable modem services within the confines of the City.

### 2. The City's contentions

#### a. Whether the fee the City seeks to collect is a "franchise fee"

█ The City's principal contention is that the 5% fee it seeks to collect on Comcast's cable modem revenues is not a "franchise fee" within the meaning of § 542(b). Therefore, the City reasons, § 542(b) does not preempt the Agreement as to that fee or apply to that fee at all. We reject the City's argument.

The City begins with the statutory definition of "franchise fee." According to § 542, "the term 'franchise fee' includes any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, *solely because of their status as such.*" 47 U.S.C.A. § 542(g)(1) (West 2001) (emphasis added). The City argues that the fee it wants to

collect from Comcast is not a fee imposed solely because of Comcast's status as a cable operator—rather, it is imposed because of Comcast's provision of cable modem services, which is an activity that does not fit under the "cable operator" umbrella. A "cable operator" is "any person or group of persons (A) who provides cable service over a cable system and directly or through one or more affiliates owns a significant interest in such cable system, or (B) who otherwise controls or is responsible for, through any arrangement, the management and operation of such a cable system." *Id.* § 522(5). Focusing solely on § 522(5)(A), the City argues that a fee is a "franchise fee" only if it is imposed on an entity solely because of its status as a provider of "cable service." Because the City imposes the fee in question on Comcast because of its status as a provider of cable-*modem* service, not cable service, the City argues that it is not a "franchise fee" subject to § 542(b).

The City's argument fails because it does not reckon with the entire statutory definition of "cable operator." A company is not a "cable operator" only when and to the extent it is providing cable service. A company is also a "cable operator" if it controls or is responsible for the management and operation of "such a cable system," meaning a cable system over which cable service is provided. *See id.* § 522(5)(B). There is no dispute that Comcast provided cable service over its cable system, in addition to cable modem service. Thus, we conclude that Comcast's provision of cable modem service over that system was part of its management and operation of the cable system, and therefore part of its activity as a "cable operator." We further conclude, necessarily, that the City is trying to collect the fee on Comcast's cable-modem-service revenues solely because of its status as a cable operator. Accordingly, the fee is a "fran-

chise fee" that § 542(b) bars the City from collecting. *Accord AT & T Broadband, Inc.,* 2003 WL 22057905, at *3; *Comcast Cable Holdings, L.L.C.,* 900 N.E.2d at 263.

The City's interpretation of § 542(b) is flawed for another reason: it gives exactly the same effect to § 542(b) before and after the 1996 amendment to the statute, thereby making the amendment meaningless. In the City's view, a company may invoke the 5% cap on franchise fees only to the extent it is a "cable operator," and a company is a "cable operator" only to the extent it is providing "cable service," excluding cable modem service or any other kind of service. In other words, the 5% cap applies to cable-service revenues and not to any other kind of revenues. This argument would have applied equally to the statute as it existed before 1996, when it read "the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system." Pub.L. No. 98–549, 98 Stat. 2779 (codified as amended at 47 U.S.C. § 542(b)). Thus, under the City's interpretation, the 1996 addition of the words "to provide cable services" at the end of § 542(b) had no practical effect. We presume that Congress intended for its amendment to § 542(b) to have a "real and substantial effect." *Guillen,* 537 U.S. at 145, 123 S.Ct. 720 (internal quotations omitted). The City's interpretation of § 542(b) deprives the 1996 amendment of any effect, and we accordingly do not adopt it.

### b. The legislative history of the 1996 amendment to § 542(b)

The City also argues that the legislative history of the 1996 amendment to § 542(b) shows that Congress intended the amendment to affect only the treatment of tele-

communications services—not cable modem services (which hardly existed at the time). Because we have concluded that § 542(b) has a clear meaning, we need not consult the legislative history. Legislative history cannot be used to "alter and disregard the express terms of a clear and unambiguous" statute. *Robinson v. Budget Rent–A–Car Sys., Inc.*, 51 S.W.3d 425, 430 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *cf. Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 652 (Tex. 2006) ("[W]here enacted language is nebulous, we may cautiously consult legislative history to help divine legislative intent.") (footnote omitted). But even if we survey the legislative history of the 1996 amendment to § 542(b), we find no clear expression of a legislative intent contrary to the plain meaning of the statute.

The 1996 amendment to § 542(b) was only a small part of the Telecommunications Act of 1996. In a House report on an early version of the bill, H.R. 1555, the Committee of Commerce stated that the act was intended "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." H.R. REP. No. 104–204, at 1 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 10. In that same report, the committee stated that the amendment to § 542(b) "establishes that franchising authorities may collect franchise fees under [§ 542] solely on the basis of the revenues derived by an operator from the provision of cable service." H.R. REP. No. 104–204, at 93 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 59–60. Thus, this part of the legislative history supports our conclusion as to the intended effect of the 1996 addition of the words "to provide cable services" to § 542(b).

The Senate version of the bill was ultimately passed "after amending its language to contain much of the text of the House bill," 1996 U.S.C.C.A.N. at 10, including the House amendment to § 542(b). The City relies on the House conference report that was generated to accompany the amended Senate version of the bill. The conference report describes the House amendment to § 542(b) in this way:

> Subsection (b) amends section 622(b) of the Communications Act [47 U.S.C. § 542(b)] by inserting the phrase "to provide cable services." This amendment makes clear that the franchise fee provision is not intended to reach revenues that a cable operator derives for providing new telecommunications services over its system, but only the operator[']s cable-related revenues.

H.R. REP. No. 104–458, at 180 (1996) (Conf. Rep.), *reprinted in* 1996 U.S.C.C.A.N. 10, 193. The report then describes the final agreement in this manner:

> The conference agreement adopts the House provision with some minor, technical modifications. The conferees intend that, to the extent permissible under State and local law, telecommunications services, including those provided by a cable company, shall be subject to the authority of a local government to, in a nondiscriminatory and competitively neutral way, manage its public rights-of-way and charge fair and reasonable fees.

*Id.* The City argues that these passages from the conference report show that the amendment to § 542(b) was intended to affect the treatment of telecommunications services only, and that Congress intended to permit local governments to charge franchise fees for information services.

We disagree with the City. The conference report shows that the report authors were specifically contemplating differential

treatment for telecommunications-service revenues and cable-related revenues. But the report says nothing about information-service revenues, such as cable-modem service, one way or the other, so the report does not show any congressional intent as to how revenues from those particular services would be treated. The first-quoted passage from the conference report, however, does show a general philosophy that technological innovation should be encouraged by limiting franchising authorities' fee base to revenues derived from traditional cable service. Although the second-quoted passage does show an intention to allow "fair and reasonable fees" on telecommunications services, that passage says nothing about information services such as the cable modem services we are considering in this case. Nor does it explain how to harmonize that intention with the simultaneous amendment of § 542(b) to limit the revenue base from which franchise fees may be calculated.

In the 1996 amendment to § 542(b), Congress clearly divided the universe of cable-system services into two categories: "cable services" and everything else. It further clearly intended to limit franchise fees imposed on cable system operators to 5% of their revenues from "cable services." We conclude that the legislative history does not undermine our interpretation of the plain language of the statute.

### c. The City's other arguments

■ The City contends that we should not apply § 542(b) to the Agreement because that would be a retroactive application of the law that was not clearly intended by Congress. *See United States v. Magnolia Petroleum Co.,* 276 U.S. 160, 162–63, 48 S.Ct. 236, 72 L.Ed. 509 (1928) ("Statutes are not to be given retroactive effect or construed to change the status of claims fixed in accordance with earlier pro-

visions unless the legislative purpose so to do plainly appears."). Comcast replies that applying § 542(b) to the Agreement from March 2002 forward is not a retroactive application of the law.

■ Determining whether a particular operation of a statute is retroactive or "retrospective" is not always a "simple or mechanical task." *Landgraf v. USI Film Prods.,* 511 U.S. 244, 268, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Application of a statute is not automatically retroactive just because it is applied to conduct predating the statute's enactment, or even because it upsets expectations based on prior law. *Id.* at 269, 114 S.Ct. 1483. The Supreme Court has said that the determination of whether a particular rule is operating "retroactively" is largely a matter of judgment, weighing "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 270, 114 S.Ct. 1483. "[F]amiliar considerations of fair notice, reasonable reliance, and settled expectations offer sound guidance." *Id.*

We conclude that our decision to apply § 542(b) to the parties' preexisting Agreement is not a retroactive application of the statute. The parties acknowledge that the 1996 amendment to § 542(b) was enacted before cable companies began selling cable modem services. Thus, franchising authorities like the City could not have developed any degree of reliance on revenue derived from franchise fees on cable-modem-service revenues at the time § 542(b) was enacted. Nor does the City explain how our application of § 542(b) to the Agreement upsets any "settled expectations" of the parties to the Agreement. Accordingly, under the factors set forth in *Landgraf,* we reject the City's contention that we are inappropriately giving § 542(b) retroactive effect.

Finally, the City argues that the precedents from other jurisdictions are not persuasive because the franchise agreements involved in those cases explicitly incorporated federal law but the Agreement in this case does not. This distinction is not significant. Every contract incorporates the laws that exist at the time and place of its making, regardless of whether that incorporation is express. *McCreary v. Bay Area Bank & Trust*, 68 S.W.3d 727, 733 (Tex.App.-Houston [14th Dist.] 2001, pet. dism'd). More importantly, when a contract deals with a subject matter that is within the control of Congress, it is subject to regulation by Congress whether it expressly acknowledges Congress's authority or not:

> Contracts, however express, cannot fetter the constitutional authority of Congress. Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them.

*Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223–24, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (internal quotations and citation omitted). Thus, contrary to the City's position, it does not matter that the Agreement does not expressly recognize or incorporate federal law. Section 542(b) preempts it regardless.

## C. Conclusion

The City sued Comcast on five counts: breach of the Agreement, breach of implied contract, quantum meruit, unjust enrichment, and trespass. The agreed issue on appeal is whether § 542(b) preempts the City's claim that the Agreement entitles the City to collect its 5% franchise fee from Comcast on revenues attributable to the provision of cable-modem service within the confines of the City. We hold that it does. Accordingly, we conclude that the trial court should have rendered summary judgment for Comcast on the City's first count, breach of the Agreement.

Comcast argues that, in the interest of judicial economy, we should also conclude that the trial court should have rendered summary judgment for Comcast on the City's four remaining counts, even though those counts are not based on breach of the Agreement. It repeats its arguments from its summary-judgment motion that the other four counts all seek to recover monies that fall within the statutory definition of "franchise fee," namely, "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such." 47 U.S.C.A. § 542(g)(1). The City makes no argument in its appellee's brief defending its four remaining counts.

We conclude that the agreed issue presented to us in this interlocutory appeal encompasses only the City's first count, for breach of the Agreement. The issue presented does not encompass the City's four counts that are not based on breach of the Agreement. Accordingly, we express no opinion as to the effect, if any, our holdings may have on the City's counts for breach of implied contract, quantum meruit, unjust enrichment, and trespass.

## IV. Disposition

We reverse the trial court's February 17, 2009 order denying Comcast's motion for summary judgment. We render judgment that the City take nothing on its claim for breach of the Franchise Agreement and remand for further proceedings consistent with this opinion.